NORTHEASTERN GAS TRANSMISSION COMPANY *v.*
ANTOINETTE D. LAPHAM ET AL.

SUPERIOR COURT          FAIRFIELD COUNTY          FILE No. 83633

NORTHEASTERN GAS TRANSMISSION COMPANY *v.*
HELEN G. ALTSCHUL

SUPERIOR COURT          FAIRFIELD COUNTY          FILE No. 83352

NORTHEASTERN GAS TRANSMISSION COMPANY *v.*
GEORGE H. JELLIFF, JR., ET AL.

SUPERIOR COURT          FAIRFIELD COUNTY          FILE No. 83630

NORTHEASTERN GAS TRANSMISSION COMPANY *v.*
JOSEPH WEBER, JR.

SUPERIOR COURT          FAIRFIELD COUNTY          FILE No. 83657

Memorandum filed September 13, 1955.

*Marsh, Day & Calhoun,* of Bridgeport, for the plaintiff in all cases.

*Maguire, Walker & Middleton,* of Stamford, for the defendant in No. 83352.

*Morse & Marvin,* of New Canaan, and *Maguire, Walker & Middleton,* of Stamford, for the defendants in Nos. 83633, 83630 and 83657.

COMLEY, J. The first-captioned case is one of four actions which were brought under Cum. Sup. 1953, § 1963c, to determine the amount of compensation to which the defendants are entitled for the taking by eminent domain of easements across their properties for the installation of natural gas pipe lines. A committee of three persons was appointed for this purpose. Its report to the Superior Court was rejected and a new committee was appointed. See *Northeastern Gas Transmission Co.* v. *Altschul,* 18 Conn. Sup. 461. The report of the latter committee is now before the court upon exceptions filed by the plaintiff.

The first report was rejected on the ground that the committee erred in allowing as an element of damage to the defendants depreciation in market value of their properties beyond the boundaries of the easements due to a well-founded fear on the part of the public that a gas pipe line constitutes a dangerous hazard to persons or properties in the immediate neighborhood. In the report of the second committee the same element of damage was recognized and constitutes a portion of the compensation awarded to each of the defendants. The plaintiff now strongly urges that this is ground for rejection of the report since the second committee was in effect instructed by this court that damages for such depreciation in market values could not be allowed as a matter of law. That was not the effect of the decision

above cited. It was not there determined that such depreciation could not be properly allowed as damages but only that the evidence introduced before the first committee was inadequate, and much of it inadmissible, to support the findings of fact. The new committee was not thereby forbidden to take evidence or to make findings of fact with reference to that element of damages and, in so doing, it did not violate the rules for the governance of committees laid down in *Stehlin-Miller-Henes Co.* v. *Bridgeport,* 97 Conn. 657.

The committee has made the following findings with reference to the disputed items of depreciation:

19. A natural gas transmission line such as the plaintiff's may leak or rupture by reason of one or more of these three causes: failure of the system itself, interference therewith by some outsider, or disturbance of the support of the line.

20. The plaintiff concedes "that natural gas, just as any other highly inflammable substance, is dangerous if improperly handled."

21. At the 717 pounds pressure permitted the plaintiff by the Public Utilities Commission, it is obvious that a substantial leak or rupture in the plaintiff's pipe would result in the escape of a very large quantity of gas in a very short time.

22. Although the Tennessee Gas Transmission Company, of which the plaintiff is a wholly owned subsidiary, has complied with the A.S.I. Code requirements in the construction of its high pressure gas transmission pipelines, as has the plaintiff as to its pipe-line in question under the P.U.C. Regulations, there have been leaks and ruptures in the pipelines of the former Company, as testified to by King, its vice president in charge of its engineering and research.

23. Such a leak or rupture could result from interference with the pipe-line by a third party, as for example, by the use of grading machinery in too close proximity thereto, or by possible negligence of the plaintiff in its maintenance or operation.

24. In the event of such a leak or rupture, a very large volume of gas so released, as recited in par. 21 supra, would be exposed to ignition precipitating a devastating explosion imperiling life and property in the surrounding area.

25. Confirmation of the fact that such catastrophe could and might happen is indicated by the strict and inclusive provisions in the P.U.C. Regulations designed to guard against and mitigate the danger of such occurrences.

26. The maintenance and operation of the plaintiff's existing high pressure natural gas transmission pipe-line pursuant to the easement which it has acquired over the properties of the defendants constitute an element of danger in fact, which renders the belief of such danger "well founded."

27. The fact that the gas transmitted through this pipe-line is highly inflammable and "dangerous if improperly handled," which the plaintiff concedes as stated in paragraph 20, and the further fact that there may be negligence resulting in such improper handling, are matters of common knowledge.

28. Furthermore the fact of the power which the legislature as representing all of the people of the state, has accorded the Public Utilities Commission to act in re natural gas pipe-lines, to guard against conditions "dangerous to public safety or to the safety of employees" (§§ 1971c, 1972c, 1969c, and 1970c of the 1953 [Cum. Sup.]), as implemented by the Public Utility Commission Regulations, is indicative and confirmatory of the existence of a general knowledge and belief in the public mind of the danger incident to the maintenance and operation of natural gas pipe-lines.

29. This knowledge and belief was asserted to the plaintiff by (Hess) one member of the public and found specific recognition in the language of the agreement which he exacted from it in granting a right of way for its pipe-line over his property, which provides that the plaintiff agrees to "save" the grantor owner "Harmless . . . of and from any and all loss of damage or the aggravation of any loss or damage to persons and/or property hereafter accruing due to leakage, explosion and/or other failure of said pipe-line and the facilities installed therewith to operate safely."

30. Such a mishap with consequent damage upon adjacent properties, even if not probable, is certainly possible, and therefore a potential factor affecting their market value. (*Andrews* v. *Cox*, 127 Conn. 455, 462.)

31. While a number of houses have been purchased and others built on property either subject to or near the plaintiff's pipe-line, indicating in such instances either a lack of the knowledge and belief referred to in paragraphs 28 and 29, or a disregard thereof, other prospective purchasers of land have been reluctant to buy because of their knowledge and belief of such danger.

32. The well-founded belief in the danger incident to the maintenance and operation of the plaintiff's high pressure natural gas transmission pipe-line set forth in paragraph 26 supra, is a belief general in the public mind and constitutes a well founded public belief.

33. Since a well-founded public belief of danger from the pipe-line exists as stated in paragraph 32, this constitutes an element of damage to be considered in so far as it affects the market value of the defend-

ants' land. The extensive sale of house lots near to the pipe-line and of others actually subject to the pipe-line easement and the construction and occupancy of residences on many of them, as recited in paragraph 31, demonstrates, however, that this fear is of so restricted a nature that its effect on market value is limited both as to area involved and dollar value within such area. In the instant case it is a material factor only as to such land in close proximity to the pipe-line as is either suitable or adaptable for residence purposes.

From these subordinate facts the committee drew the ultimate conclusion in paragraph 45 (7) of the report that "fear of explosion or other danger from the pipe-line" was one of the elements of depreciation and in paragraph 45 (4) that "possibility of the imposition of municipal restrictions designed to safeguard against possible hazards of the pipe-line" was another element of depreciation. In paragraph 46 it concluded that the amount of depreciation due to the first element was 10 per cent of the fair market value of the adjoining acreage and that the amount due to the second element was 3 per cent.

The plaintiff's exceptions raise two questions: first, whether the subordinate facts justify the ultimate conclusions and, second, whether there was evidence before the committee to support the subordinate facts.

The conclusion that depreciation in the market value of the remaining acreage due to a public belief in the dangers connected with a natural gas pipe line is a compensable item of damage also raises a question of law. The general rule of compensation in eminent domain is that the owner is entitled to the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter. *Andrews* v. *Cox,* 127 Conn. 455; *Stock* v. *Cox,* 125 Conn. 405. In the former case, at page 458, it is said that "in determining market values in awarding damages for land taken, it is proper to consider all those elements

which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land." Everything which may legitimately affect market value must be considered. *Holley* v. *Torrington*, 63 Conn. 426, 433. In this state it was established by the case of *Meriden* v. *Zwalniski*, 88 Conn. 427, that an unfounded belief in the existence of a danger does not afford ground for compensation even though it may affect market value for, as is pointed out at page 434, the depreciation in such a case does not result from the taking but from the "ignorance, prejudice, or folly of those who wrongly conceive and believe that it will cause them damage." It is a necessary inference from the decision in that case that where the public belief in the existence of the danger is well founded, the resulting depreciation in market value is a legitimate element of compensation. This accords with the weight of authority elsewhere. *Gulledge* v. *Texas Gas Transmission Corporation*, (Ky. App.) 256 S.W.2d 349; *Texas Pipe Line Co.* v. *National Gasoline Co.*, 203 La. 787; *Tennessee Gas Transmission Co.* v. *Adamsen*, (Tex. Civ. App.) 262 S.W.2d 445; *Manufacturers Natural Gas Co.* v. *Leslie*, 22 Ind. App. 677; *Langdon* v. *Loup River Public Power District*, 142 Neb. 859; 1 Orgel, Valuation under Eminent Domain (2d Ed.) p. 276; 5 Nichols, Eminent Domain (3d Ed.) § 16.103 (1); Note, 38 A.L.R.2d 801, § 8.

Applying this rule of law to the subordinate facts found by the committee, its conclusion that there is a depreciation in the market values of the defendants' acreage in proximity to the pipe line and that such depreciation is due to a well-founded public fear of danger is amply justified.

There remains for consideration the question whether there was evidence to support the findings of subordinate facts. This has required a reading of

the entire transcript. It goes without saying that the matter of the credibility of the witnesses lay exclusively within the province of the committee. There is no occasion in this memorandum for an extensive analysis of all the testimony. It is sufficient to point out that the committee had before it the following significant evidence and the reasonable inferences to be drawn from it.

The witness Joseph L. Parrish testified in great detail at the commencement of the hearing as to physical characteristics of the pipe line, the methods of manufacture, tests as to strength, the manner of the preparation of the ground and the trench for receiving the pipe and the actual laying of the line. The witness Allen J. Johnson, having been accepted as a qualified expert by the committee, gave his opinion that the line is dangerous, that there have been several hundred gas line failures in the United States, and that there are several reasons to fear a failure in this particular line. As a real estate expert, the witness Samuel F. Pierson testified categorically that the market values are definitely affected by the potential hazards. To the same effect was the testimony of the witness Roland B. Webb and the witness George C. Castles.

To offset this testimony, the plaintiff produced the witnesses Martin J. Beccia, Reubin Kuklinsky, Fred Freedson, Ralph E. Sprague and Arthur Abeshouse, but, as pointed out above, the question of accepting this testimony as against that offered by the defendants was solely a matter for determination by the committee. And in the case of the witness Freedson it is significant to note that while he did not think that existence of the line had affected market values, he did state that it had affected the "time element" in consummating sales and that "in every case the question was brought up." Also the witness Abeshouse gave only the limited and quali-

fied opinion that while he did not think the line had depreciated market values he could not so state "dogmatically."

But perhaps most significant of all was the testimony of Joe J. King, who is vice president of the Tennessee Gas Transmission Company in charge of engineering and research. While testifying for the plaintiff that his company had not had any explosions in its lines and that, in his opinion, there was no possibility of an explosion in this particular line, he did state that it has had "leaks and pipeline failures" and that it has had "ruptures." Also, the committee might well have drawn reasonable inferences from his description of the care and vigilance exercised by the company in patrolling its lines to detect any leaks or failures and its system of reporting any trouble to the chief dispatcher at Houston, Texas.

Also, with reference to its findings of depreciation due to a reasonable anticipation of hampering municipal regulations, the committee had before it the opinions of the witness Pierson, the witness Webb, the witness Castles, the rules and regulations of the planning commission of the city of Norwalk and the special acts and ordinance of the town of Woodbridge.

From the foregoing, the court concludes that the findings of the committee were supported by the evidence, that its conclusions were properly drawn from the subordinate facts and that these conclusions are in accordance with the law.

Under the provisions of § 1963c of the 1953 Cumulative Supplement, the defendants are entitled to an award of reasonable attorney and appraisal fees, since the total damages determined by the second committee in the amount of $45,176 exceed by about $31,000 the total offers of $14,175 made by the plain-

tiff. The defendants request an attorneys' fee of $60,000 for services to date and an additional fee of $6000 to cover an anticipated appeal to the Supreme Court of Errors. This request is based in large part, if not wholly, upon a mathematical calculation involving two factors:—first, the number of hours taken from the office records of the several attorneys multiplied by an hourly rate of compensation. This calculation takes into account only one element in the ascertainment of reasonable compensation and entirely overlooks the other elements commonly recognized as of primary importance in such determination. The plaintiff's memorandum on the subject contains a powerful and persuasive attack upon the defendants' request which the court refrains from here repeating. Under all the circumstances, the court awards a total of $15,000 as a reasonable attorneys' fee in the four cases. Of this amount, $10,650 is awarded in the Lapham case, $2850 in the Altschul case, $1200 in the Jelliff case and $300 in the Weber case.

Under the statute, the defendants are also entitled to an award of reasonable appraisal fees. At the hearings before the first committee they produced five appraisers. Before the second committee only one of these five was produced. Two additional appraisers, who had not appeared before the first committee also testified. This has undoubtedly increased greatly the expense. Moreover, the appraisals given before the first committee were fantastically high, being more than twice as high as those given before the second committee and more than six times the final awards. It is difficult to see how they could have been of much value to anyone.

In the Lapham case, appraisers' fees are awarded as follows: for the witness Pierson, $400; for the witness Lundy, $150; for the witness Webb, $400; for

the witness Crandall, $150. In the Altschul case, appraisers' fees are awarded as follows: for the witness Pierson, $100; for the witness Castles, $500; for the witness Weissman, $250; for the witness Halliwell, $250. In the Jelliff case, appraisers' fees are awarded as follows: for the witness Lundy, $50; for the witness Webb, $50; for the witness Crandall, $50. In the Weber case, appraisers' fees are awarded as follows: for the witness Lundy, $50; for the witness Webb, $50; for the witness Crandall, $50.

In the Lapham case (Docket No. 83633) the exceptions to the report of the committee are overruled, the report is accepted and judgment thereon is rendered for the defendant to recover from the plaintiffs the sum of $32,102, with interest thereon from April 22, 1952.

Judgment is also rendered for the defendants to recover from the plaintiffs reasonable attorneys' fees in the amount of $10,650 and reasonable appraisal fees in the sum of $1100, to be apportioned as follows: for the witness Pierson, $400; for the witness Lundy, $150; for the witness Webb, $400; and for the witness Crandall, $150.