This proceeding is an appeal from the assessment of damages by condemnation that has come to the court on the wrong procedural tracks, to which it had been directed by the court clerk on instruction from the civil court manager of the court operations division. As the initial result of this misdirection, the title of this action is the reverse of what it should be. It is to this procedural gaffe that the court must first direct its attention.
On April 14, 1997, the Bristol city council, under the authority of Special Acts 1996, No. 96-12, granting municipal corporations the right to purchase by eminent domain, under General Statutes § 48-12, groundwater rights or interests therein extending beyond its corporate limits after the closing of a landfill, voted to acquire such rights in the property of Sebastian A. Milano and Linda L. Milano located in the adjoining town of Southington. Thereafter, condemnation proceedings were commenced by the city of Bristol (city) pursuant to the statutory procedural requirements.
Under the provisions of General Statutes § 8-129, a statement of compensation was filed with the clerk of the Superior Court on July 18, 1997. An amended statement was filed on July 29, 1997, clarifying that this proceeding was pending in the court venue at Hartford. Upon the original filing of this statement and its accompanying deposit of $8000, the amount of the assessed damages, with the clerk of the Superior Court at Hart ford, the clerk's office gave the deposit file the above docket number. All of this was in accordance with the *Page 607 
statutory and procedural requirements. General Statutes §§ 8-129 and8-130; Practice Book Form 404.1.
After the city filed a return of notice to all persons having a record interest in the property, the clerk, on August 15, 1997, issued the statutory certificate of taking conveying title to the city of the subject property being condemned for recordation on the land records of Southington. General Statutes § 8-130; Practice Book Form 404.1.
On October 3, 1997, the property owners filed an appeal and application for review of statement of compensation pursuant to General Statutes § 8-132. See Practice Book Form 404.2. At this point, the clerk's office deviated from its former and correct course of procedure. On March 31, 1997, the court operations office distributed to all clerks, through its civil court manager, policy and procedure order no. CV-97-33 entitled "Highway and Redevelopment Condemnation Policies and Procedures", of which the court takes judicial notice.
Instead of issuing the requested order of notice required by § 8-132, the clerk's office, on October 9, 1997, sent a copy of the appeal and application for review to the city's counsel, duplicating an earlier mailing by counsel for the Milanos. No statutory entry fee was requested. See General Statutes § 52-259. The appeal was procedurally processed as a motion in the deposit file, docket no. 572222, the same file and docket identification as noted above in this proceeding.
The procedure established and followed in this condemnation under policy no. CV-97-33 is contrary to long established eminent domain law. The court clerks and parties to condemnation proceedings are being instructed contrary to proper and legal procedure. The policies and procedures directed by policy no. CV-97-33 should be forthwith revoked. *Page 608 
The origin of policy no. CV-97-33 is stated in its memorandum as follows: "In light of the recent discovery of Town of Killingly v. RalphW. Wells, 18 Conn. App. 508, the following policies and procedures are to be implemented." The important procedural changes required to be followed were: "Upon the filing of a statement of compensation, pursuant to C.G.S. Section 8-129 or an assessment of damages and benefits, pursuant to C.G.S. Section 13a-73 (b) the clerk's office is to collect a fee of $2.00 as required by C.G.S. Section 52-259 for `receiving and filing an assessment of damages. . . .' A civil docket number is to be assigned to the case and a civil file is to be created. . . . When processing the fee through the cash register, please enter code 170 . . . to account for the docket number, then code 825 (no fee required by statute or practice book rule), followed by code 810 for the $2.00 that is actually collected. Type ASSESSMENT when asked for a description. . . .
"Pursuant to C.G.S. Section 8-132, if the condemnee does not agree with the statement of compensation filed by the redevelopment agency, the condemnee may file with the Superior Court an application for review of the statement of compensation.
"Upon the filing of the application for reassessment of damages and benefits or the application for review of the statement of compensation, the application is to be placed in the existing court file containing theassessment of damages and benefits or the statement of compensation. As aresult of the above change in procedure, only one court file willexist." (Emphasis added.)
Killingly v. Wells, 18 Conn. App. 508, 558 A.2d 1039 (1989), stands alone on its facts and holdings. It has no precedential value on the law or procedure in condem nation actions. There is no legal basis or support in Killingly for the publication of policy no. CV-97-33 changing the long *Page 609 
established law, procedure and clerical policies relating to condemnation cases.
In Killingly, the deposit file name and docket number were later given to the trial file, no. 97. Thereby, the proper designation of plaintiff and defendant, as here, were reversed. After the issuance of the certificate of taking by the court clerk on July 6, 1987, the defendant property owner on November 30, 1987, purporting to follow § 8-132, filed an "Application For Review Of The Statement Of Compensation." The application did not follow Practice Book Form 404.2. It was not an "appeal" to the jurisdiction of the court, nor by its allegations or terms the entry or commencement of a civil action pursuant to General Statutes § 52-45a. It was not separated from the filing of the deposit. There was no proposed order of notice to be issued by the court attached to it. It was in the form of a motion with an appended order calling only for its grant or denial. The trial court denied the request at short calendar on December 21, 1987, on the ground that it was incomplete.
On February 25, 1988, the defendant property owner filed a motion for reconsideration of its denial of review. In its memorandum of decision denying this motion, the court reiterated that the "application for review" was an incomplete "appeal" that did not conform to the requirements of § 8-132. Additionally, the court concluded that since the motion for reconsideration was not filed until more than six months after the filing of the statement of compensation, "[t]he hands of the court have been tied by this delay. . . . Therefore, since the defendant has not timely affected (sic) a proper appeal, the court must deny his motion for reconsideration. "
The defendant appealed to the Appellate Court. That court, in Killinglyv. Wells, supra, 18 Conn. App. 515, set aside the judgment and remanded the case to the *Page 610 
trial court for referral of the defendant's application for review to a state trial referee for review of the statement of compensation. Eight years later, the court operations division "discover[ed]" Killingly and, based upon its decision, issued policy CV-97-33 to all judicial district chief clerks for implementation.
It is this court's conclusion that Killingly was issued in error, and the policy and procedure enforced by the Superior Court under memorandum CV-97-33 is contrary to our long established law, procedure and practice in condemnation proceedings.
The issue presented there on appeal was whether the defendant's application for review was legally sufficient under § 8-132. There were three claimed deficiencies in the application. As to the failure to use the term "appeal" specified in the title of the law and Practice Book Form 404.2, the court held that denial for that reason would clearly be elevating form over substance. Although a description of the property is essential for the statement of compensation in § 8-129, the court reasoned that reference to the statement of compensation was sufficient under § 8-132 for the description called for.
As to the lack of an order of notice required by Practice Book Form 404.2, the court said that "not only does the statute require the court to provide notice of the application to the town, but we note that counsel for all parties attended the December 21, 1987 hearing on the defendant's application for review, thus indicating that all parties had actual notice." (Emphasis added.) Killingly v. Wells, supra,18 Conn. App. 514-15. "We therefore conclude that the trial court erroneously denied the defendant's application for review." Id., 515.
In obiter dictum, responding to the plaintiff's claim that § 8-132, as it has been implemented by custom, requires the filing of a separate action, collateral to the *Page 611 
condemnation proceeding and seeking a review of the statement of compensation, the court simply stated that "the statute does not require such a procedure. . . . The language of § 8-132 simply does not mandate the initiation of a separate action to test the adequacy of a condemnation award." Killingly v. Wells, supra, 18 Conn. App. 513. It is this dicta that policy memorandum CV-97-33 of the court operations division is predicated on.
The dicta in Killingly and its subsequent implementation in policy CV-97-33 are contrary to, and invalidated by two prior holdings of our Supreme Court reaffirming our long established practice and procedure in condemnation actions under the provisions of § 8-132. "`[T]he docketing of the statement of compensation in the clerk's office of the Superior Court did not originate a civil action. ' Simmons v. State,160 Conn. 492, 494 n. , 280 A.2d 351 [(1971)]." Karp v. UrbanRedevelopment Commission, 162 Conn. 525, 527, 294 A.2d 633 (1972). "Where statutes provide an efficacious procedure for assuring just compensation, that procedure will be followed. . . . The provisions of § 8-132 provide an efficient procedure for vindicating the common-law right to just compensation for a taking of property by eminent domain. . . . The procedure under § 8-132 is mandatory." (Citations omitted.) Id., 529-30.
The initiation of an eminent domain proceeding by the filing in court of a statement of compensation under § 8-129, followed by the deposit with the clerk of the Superior Court of a sum of money equal to the amount set forth in the statement of compensation under § 8-130, is not a civil action or contested matter between condemnor and condemnee. It is the beginning of the due process of law required for the taking of private property. Notice and copy of the statement of compensation must be given in the manner required "for the service of civil process." General Statutes § 8-129. "[S]uch clerk shall, without any delay or continuance *Page 612 
of any kind, issue a certificate of taking setting forth the fact of such taking, a description of all the property so taken and the names of the owners and of all other persons having a record interest therein. The redevelopment agency shall cause such certificate of taking to be recorded in the office of the town clerk of each town in which such property is located. Upon the recording of such certificate, title to suchproperty in fee simple shall vest in the municipality, and the right tojust compensation shall vest in the persons entitled thereto." (Emphasis added.) Id. At that point, the condemnation process has been completed and the property taken under due process of law. The property taken belongs to the condemnor, and the deposit, held by the clerk as stakeholder, belongs to the condemnee.
The owner of the property taken has two courses open to him or her. The deposit has the effect of a tender by the condemnor. The owner of the property may file a written acceptance with the clerk of the court. General Statutes § 8-131. Should the owner feel aggrieved, the owner may contest the amount of the compensation offered by an appeal to the court in a civil action separate from the filing of the deposit in court. See Salgreen Realty Co. v. Ives, 149 Conn. 208, 213-14, 177 A.2d 673
(1962). The appeal by the owner of the property taken by the completed unilateral condemnation action, and contesting and seeking a review of the amount of compensation available to the owner by the statement and deposit, is the entry and docketing of a civil action. The condemnee is the plaintiff and the condemnor is the defendant. It is subject to the requirements of § 52-45a, and to the payment of the entry fee required by § 52-259 upon filing of the appeal and application for review of statement of compensation in the clerk's office. The appeal and application for review cannot be heard and decided as a short *Page 613 
calendar or trial motion in a deposit file or docket opened previously by the court clerk for the acceptance, retention and payment of the amount of damages assessed by the condemnor upon his taking of the property. An order of notice to, and citation served upon, the condemnor for his appearance in the civil action for the appeal and application for review of statement of compensation, are required. A citation is not synonymous with notice. Simko v. Zoning Board of Appeals, 205 Conn. 413, 420,533 A.2d 879 (1987); Village Creek Homeowners Assn. v. Public UtilitiesCommission, 148 Conn. 336, 338-39, 170 A.2d 732 (1961).
Notwithstanding the unique and misdirected procedural history of this condemnation action under the direction of the court clerk pursuant to policy memo CV-97-33, the parties to this appeal have submitted to the jurisdiction and judgment of this court on the reassessment of damages. Because of this crossover or reversal of their correct and proper respective party positions and designations, the court will proceed to determine the merits of their respective claims, designating Sebastian A. Milano and Linda L. Milano appellants and the city of Bristol named appellee in this proceeding to avoid any future confusion of their status in the decision and judgment on this appeal.
 II
Sebastian A. Milano and Linda L. Milano, property owners, have appealed from the assessment of damages in the amount of $8000 paid by the city of Bristol for the partial taking by eminent domain for thirty-one years of certain property rights over a portion of their premises known as 2030 West Street, in the town of Southington. The taking was required because of the closure of the city's solid waste disposal area, commonly called a land fill, pursuant to consent order no. SW-375, dated October 24, 1995, under the supervision of the state department *Page 614 
of environmental protection (department). This order required the city to obtain as against the premises of the Milanos the easements and certain specific rights thereunder taken pursuant to this condemnation proceeding against them.
The subject property and easements are more particularly shown and designated on a map entitled "Map Showing Easements On Property of SEBASTIAN A. MILANO LINDA L. MILANO, West Street, Southington, Connecticut, 1" = 100' 09-25-96, Fuss O'Neill Inc., Consulting Engineers." The taking included four delineated easements and one undelineated easement, each of which shall terminate automatically thirty-one years from the taking. The first easement taken is designated as "Zone of Influence Easement Area" and includes 40,970 square feet, more or less.
"Zone of influence" is defined in the consent order as "the area of soil and groundwater within which the treatment of the leachate discharge by soil and mixing of leachate with groundwater occurs, and could reason ably be expected to occur, and therefore, within which some degradation of groundwater quality has occurred or is anticipated to occur." (Emphasis added.)
The second and third easements are separately designated as "Access Easement Area." The second easement overlaps the first easement and contains 57,970 square feet, more or less, and the third contains 35,100 square feet, more or less. The fourth easement taken is designated "Monitoring Well Easement Area" and affects 2540 square feet, more or less. In addition, the "condemner (sic) shall have (i) for a period of two (2) years from the date upon which it takes title to the Easements, the right to enter on, over, across, under and upon the Access Easement Area and the Monitoring Well Easement Area on foot or by vehicle and transport such machinery and materials as may be required for *Page 615 
the purposes of boring, constructing and installing four (4) certain monitoring wells, designated within the Monitoring Well Easement Area on the Map, and associated pumps, piping, hardware and equipment." The undelineated easement for the installation of the wells and necessary equipment was requested by the Milanos as an alternate route to reduce the cutting of trees and interference with their use and enjoyment of the remaining property.
The groundwater rights acquired by the city within the zone of influence easement area are extraordinary and include the right "to release and deposit contaminants and pollution directly or indirectly, into, on or in the groundwaters and subsurface soils and formations within the Zone of Influence Easement Area." Concomitant to that right is the right of remediation "to pump and treat water from the Access Easement Area for the purpose of remediating contamination from the City of Bristol Municipal Landfill (the `Landfill') of the ground water within the Zone of Influence Easement Area."
The taking affected premises of the Milanos consisting of approximately 5.98 acres of residential property at the rear of a gravel right of way, shared with others, fifteen feet wide and 1600 feet long, which provides access to West Street, state route 229. The Milano dwelling is a large custom-built log home in a well maintained and groomed parklike setting. The immediate surroundings are quite, peaceful and private. The zoning classification is residential R-40. The site has rolling topography, and the northwest corner is traversed by the Eight Mile River and its wetlands. Water is supplied by a well and sanitation is furnished by a septic system. The surrounding area is residential, commercial and light industrial.
Both parties are in agreement, and the court so finds, that the highest and best use of the subject property is the continuation of its present residential use. *Page 616 
The appellants' appraiser utilized the market sales approach to estimate the value of the property before the taking. Using three local comparable sales, he found the fair market value of the property to be $167,000. Noting that the city is acquiring the right to pollute the groundwaters and subsurface soils of the Milano property for thirty-one years, he opined that this "right to pollute" could have serious ramifications to the site's utility, and its exercise would result in a significant adverse effect on the appeal and market value of the subject property. Additionally, it is situated 1600 feet from the availability of municipal water on West Street. Therefore, any remediation of possible pollution under this right taken by the city should include the cost of connection to a public water system. His conclusion, by this analysis, was that "[t]his will automatically create, or incur, a stigma to subject property."
In order to estimate damages resulting from this stigma, this appraiser interviewed local real estate agents, who suggested a loss in property value between twenty percent and, unbelievably, one hundred percent. From this inquiry, he "selected a factor of 50% to reflect the loss in market value to subject property," reflecting: "Value Subject to Contamination Clause $83,500."
The city's appraiser limited his valuation to the fee simple interest, assigning a value of $ x to the improvements, as the taking affected the land only and, in his opinion, did not negatively impact on the residential improvements. He utilized the market sales comparison approach to estimate the value of the land before the taking. Sixteen lot sales in six developments, and three other land sales, all in Southington, were selected as primary indicators of value for the Milano site. Based on the brackets set by these sales, he concluded that the value contribution of the site to the overall value of the Milano property as of the taking was $75,000 to $80,000. The court notes that although he did not *Page 617 
calculate replacement cost, the Milanos' appraiser estimated the site value to be $65,000.
The taking consisted of four thirty-one year easements to facilitate department requirements for the closure of the city's landfill. The consent order requires the city to control the rights to the groundwater within the plume of the landfill for the purposes of characterizing, monitoring and, if necessary, remediating the groundwater. The city's appraiser concluded that the taking diminished the unit value of the land in the four easement areas. Describing the bundle of rights in each of these four elements of the taking, he quantified both (1) the percentage of the land encumbered by the easement, and (2) the percentage of the easement area affected by the easement rights. In this manner, he derived a reduction in the site value contribution before the taking of $75,000 to $80,000 of 7.7 percent to 13.2 percent. Thereby, the rounded significant value range after the taking was $67,500 to $71,500. By subtraction, his damage estimate was found to be $7500 to $8500, rounded to $8000.
In his analysis, he considered as a mitigating factor that the consent order sets forth a process for the closure of the landfill under the department's supervision. Relying upon his appraisal and other experience, he "determined that there would be no negative stigma associated with the taking."
A cost approach was developed during the course of his appraisal for use in reconciling the final estimate of damages to the total property value. Based upon the Marshall and Swift Residential Cost Handbook, he found the replacement unit cost estimate to be sixtyfive dollars per square foot for the total living area of 2065 square feet. He calculated the replacement cost of the site and improvements, allowing thirty to forty percent depreciation, to be $180,000 to $205,000 before the taking. *Page 618 
Judge trial referees sitting as a court on appeals in condemnation cases are more than just triers of fact or arbitrators of differing opinions of witnesses. They are charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, their general knowledge and their viewing of the premises. Minicucci v. Commissioner of Transportation, 211 Conn. 382,388, 559 A.2d 216 (1989); Birnbaum v. Ives, 163 Conn. 12, 21-22,301 A.2d 262 (1972); Feigenbaum v. Waterbury, 20 Conn. App. 148, 153,565 A.2d 5 (1989). It is their task to reach a result that gives the plaintiff, as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathis v. Redevelopment Agency,165 Conn. 622, 623, 345 A.2d 33 (1973); Feigenbaum v. Waterbury, supra, 153-54.
"When only a part of a tract of land is taken for the public use, `just compensation' includes recovery for the part taken and recovery for any damages visited upon the remainder which result from the taking. Bowenv. Ives, 171 Conn. 231, 238, 368 A.2d 82 [(1976)]; Meriden v. HighwayCommissioner, 169 Conn. 655, 659, 363 A.2d 1094 [(1975)]. `The ordinary rule for measuring damages where a portion of a tract of land is taken is to determine the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value.' Lefebvre v.Cox, 129 Conn. 262, 265, 28 A.2d 5 [(1942)]. The court should consider any and all damages which will foreseeably follow from the proper consideration of the project, including any damage to the remainder which is a necessary, natural and proximate result of the taking. Budney v.Ives, *Page 619 156 Conn. 83, 88, 239 A.2d 842 [(1968)]." D'Addario v. Commissioner ofTransportation, 172 Conn. 182, 184-85, 374 A.2d 163 (1976); Darling v.Waterford, 7 Conn. App. 485, 486, 508 A.2d 839 (1986).
"Where part of a parcel of land or an easement in it is taken by eminent domain, the general rule is that the damages are the difference between the market value of the whole tract as it was before the taking and its market value after the taking." (Emphasis added.) NortheasternGas Transmission Co. v. Tersana Acres, Inc., 144 Conn. 509, 513,134 A.2d 253 (1957); Andrews v. Cox, 127 Conn. 455, 457, 17 A.2d 507
(1941); New York, N.H. H.R. Co. v. New Haven, 81 Conn. 581, 583,71 A. 780 (1909).
In the condemnation of an easement, the owner of the property is not entitled to compensation for such easement as a "cloud on the title." But a well defined apprehension, not speculative, not unreasonable, but founded on experience or public knowledge or belief, should be considered in determining depreciation in market value of the property. In Northeast Gas Transmission Co., the plaintiff acquired a permanent easement for the construction and maintenance of a natural gas pipe line. Also included was a temporary easement ten feet wide on each side of the permanent easement. The issue relevant there was "whether [the court] erred in sustaining the committee in its decision to include as an element of the damages the public belief in the danger inherent in the presence of a gas pipe line." Northeastern Gas Transmission Co. v. Tersana Acres, Inc.,
supra, 512.
In ruling on this issue, the court held: "`[I]n determining market values in awarding damages for land taken, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land.' Andrews v. *Page 620 Cox, supra, [127 Conn.] 458. The plaintiff complains because the committee found, and the court, in accepting its report ruled, in effect, that there was a well-founded public belief in danger from the operation of the plaintiff's pipe line which affected the market value of the land now subject to the easement and that the damages should include this element. . . . A wellfounded public belief in danger from the proximity of a gas transmission line is a proper element of damages.Northeastern Gas Transmission Co. v. Lapham, 19 Conn. Sup. 468, 473
[(1955)], and cases cited; 1 [L.] Orgel, Valuation under Eminent Domain (2d Ed.) p. 279; 5 [P.] Nichols, Eminent Domain (3d Ed.) p. 41; note, 38 A.L.R.2d 788, 801." Northeastern Gas Transmission Co. v. Tersana Acres,Inc., supra, 144 Conn. 513-14.
"In the case at bar the committee did find that there was a general public belief in danger from the operation of the plaintiff's pipe line and that this belief was well founded in fact. Under these circumstances, the court properly ruled that this element of damages was to be taken into consideration in fixing the market value of the defendant's land after the taking." Id., 514-15.
Stigma is a fear that the property has an unknown element of risk attached to it owing to its history. After this fear is quantified or proven irrational, stigma should no longer affect the value of the property. 7A P. Nichols, supra, (3d Ed.Rev. 1998) § 13B.04[1], p. 13B-133.
The concern for the public health, safety and welfare from the operation and closing of the city's landfill are well documented in the findings of the department, and the agreements of the city, in consent order SW-375, executed on October 24, 1995, and their respective actions thereunder leading to these condemnation proceedings. Additionally, it is important to note in this *Page 621 
context that the Connecticut Fund for the Environment, Inc., was a party to the consent order after obtaining intervenor status on April 4, 1995, "as a party to the licensing proceedings regarding the Respondent's application for groundwater discharge and landfill expansion permits at the site."
The commissioner of environmental protection (commissioner), Found that the operation of a solid waste disposal area at the site results in a discharge of water, substance or materials, including but not limited to leachate, into the waters of the state. The city's permit for the discharge of leachate from the landfill to the groundwater at the site had expired on May 15, 1989, and had not been renewed. With the city's agreement, the commissioner, acting under his statutory authority for solid waste management, water pollution control, and compliance with the federal Water Pollution Control Act and the federal Safe Drinking Water Act, ordered the city, among other provisions, to (1) close the landfill, (2) investigate the impact and potential impact of the leachate generated at the site, both before and after closure, on the quality of surface waters including Eight Mile River, (3) investigate and deter mine the lateral and vertical extent of the zone of influence of the site, (4) perform approved remedial actions, and (5) establish the right of possession to the zone of influence in whole or in part by means of fee interest, easement, or otherwise. Each instrument establishing the right to possession shall provide (1) the right to discharge pollutants to the ground water within the zone of influence, (2) the exclusive right to withdraw groundwater from within the zone of influence and (3) the right to access the area.
In compliance with the obligations under consent order SW-375 required by orders of the department under its statutory duties for the protection of the public *Page 622 
health, safety and welfare, the city, on August 15, 1997, proceeded by eminent domain to take the easements on the Milano property necessary for public protection from the closing of its landfill. The prospective nature and extent of possible contamination of the Milano property and waters will create a reasonable and wellfounded public belief in a health hazard and danger for the duration of the easements. The presence of the minotoring wells evidences the risk of contamination. The use of the easements for the contamination of groundwaters and subsurface soils within the zone of influence easement area for up to thirty-one years is an element of damage that must be taken into consideration in fixing the market value of the Milano property after the taking. The depreciation of value in this manner is in addition to the damage resulting from the taking of the limited easements over the Milano land.
After viewing the site of the subject property, and after giving due consideration to the opinions of expert witnesses and to a knowledge of the elements that establish value, the court finds that the before taking value of the subject property was $224,000, and that the after taking value is $190,000. Damages, therefore, are assessed at $34,000.
 Judgment may enter for the appellants, Sebastiano A. Milano and Linda L. Milano, in the amount of $34,000, less $8000 already paid to them, or an excess of $26,000, with interest at eight percent per annum on such excess from the date of taking to the date of payment, together with costs and a reasonable appraisal fee of $850.