HOUSING AUTHORITY OF THE CITY OF HARTFORD
*v.* CHARTER OAK TERRACE/RICE HEIGHTS
HEALTH CENTER, INC.[1]

Superior Court Judicial District of Hartford—File No. CV-00-0800557S

Memorandum filed April 29, 2002

*Arnold & Associates*, for the plaintiff.

*Byrne & Storm*, for the defendant.

HON. WILLIAM C. BIELUCH, JUDGE TRIAL REFEREE. For those keeping abreast of the latest developments in Superior Court case law pertaining to eminent domain and redevelopment condemnation, the opening language of the present memorandum of decision will sound quite familiar. This proceeding is an appeal from

[1] An appeal to the Appellate Court by the defendant was filed on October 24, 2002; Appellate Court Docket No. AC 23589.

the assessment of damages incident to a condemnation. As with some recent decisions; see, e.g., *Commissioner of Transportation* v. *Shea*, 47 Conn. Sup. 418, 802 A.2d 239 (2002); *Newington* v. *Estate of Young*, 47 Conn. Sup. 65, 777 A.2d 219 (2000); *Commissioner of Transportation* v. *Connemara Court, LLC*, 46 Conn. Sup. 623, 763 A.2d 696 (2000); *Bristol* v. *Milano*, 45 Conn. Sup. 605, 732 A.2d 835 (2000); the present case has also come to the court on the wrong procedural track, as a result of directions given by the court clerk on instructions from the civil court manager of the judicial branch division of court operations. It was not entered on the court records as a separate civil action and the entry fee required by General Statutes § 52-259 was not paid. Rather, this appeal and application for review of the statement of compensation was filed, without payment of the statutory entry fee, as a further pleading in the matter, having the above title and docket number, that previously had been created for purposes of depositing with the clerk of the Superior Court the assessed damages in the amount of $250,000. See *Commissioner of Transportation* v. *Shea*, supra, 419; *Newington* v. *Estate of Young*, supra, 66; *Commissioner of Transportation* v. *Connemara Court, LLC*, supra, 623; *Bristol* v. *Milano*, supra, 605.

The property taken in this eminent domain proceeding by the plaintiff housing authority of the city of Hartford (housing authority) pursuant to General Statutes § 8-50 consisted of a written leasehold interest in 81 Overlook Terrace, Hartford. On July 28, 2000, the housing authority filed a statement of compensation and a deposit for the assessment of damages with the clerk of the court for the taking of the leasehold, which it found necessary for the purpose of building a job corps center. On August 14, 2000, the clerk of the court issued a certificate of taking. The housing authority recorded this certificate in the Hartford land records on the same

day pursuant to General Statutes § 8-129, thereby completing the taking and vesting the right to just compensation in the persons entitled thereto. Under the pertinent provisions of General Statutes § 8-130, "[i]nterest shall not be allowed in any judgment on so much of the amount as has been deposited in court. Upon the application of any person claiming an interest therein the Superior Court, or any judge thereof, after determining the equity of the applicant in the deposit, shall order that the money so deposited or any part thereof be paid forthwith for or on account of the just compensation to be awarded in the proceeding." The housing authority determined the amount of compensation for the subject property, which it deposited with the court clerk, to be $231,500 for the market value of the leasehold estate, together with $18,500 for moving expenses and nonremovable fixtures, for a total of $250,000.

On May 15, 1978, the Charter Oak Terrace Health Center, Inc., was incorporated, under the nonstock corporation laws of Connecticut as a nonprofit charitable corporation, for the purpose of providing health care to members of the Charter Oak Terrace, Rice Heights and neighboring communities, and establishing, operating and maintaining a medical service center, clinic or clinics or any other facility as necessary. In addition to general powers authorized by law, it was authorized to lease property necessary for its purposes. Its principal place of operation was Charter Oak Terrace-Rice Heights and neighboring areas of the city of Hartford. On December 16, 1985, the corporate name was changed to Charter Oak Terrace/Rice Heights Health Center, Inc. (center). Corporate bylaws were adopted in conformance with the amended certificate of incorporation.

On October 19, 1984, the parties entered into a memorandum of agreement to enter into the subject lease for a building to be constructed replacing existing premises

owned by the housing authority and occupied by the center. The premises were to be designed for the center's purpose of promoting expanded health services to residents of the housing authority. Under this agreement, the center undertook to engage an architect to prepare designs, construction and bid documents for a one-story addition of approximately 4800 square feet to the housing authority's existing Community Building located at 91 Overlook Terrace in Charter Oak Terrace. Upon approval of these documents by the housing authority, the center agreed to deposit with the housing authority, no later than October 19, 1984, the date of the agreement, the maximum sum of $210,750, less such sums paid for the documents, not to exceed $21,200, after which the housing authority was to award a building contract and manage its construction. The housing authority agreed to contribute the additional sum of $215,750 toward the construction costs. Should construction cost less than the two sums contributed, the excess was to be refunded to The Hartford Foundation for Public Giving.

Upon completion of construction and the issuance of a certificate of occupancy, which was granted on February 19, 1985, the center was to vacate its existing quarters and move into the new building addition to be known as 81 Overlook Terrace. This addition was acknowledged by the parties to be under the ownership of the housing authority, subject to a lease between them for a term of fifteen years, with the option of an extension of fifteen additional years, for a total term of thirty years ending on February 19, 2015. The center's occupancy under this lease was without payment of rent to the housing authority. The housing authority was to supply water without charge, and the center was to pay for heat, hot water and electricity. The housing authority provided exterior and structural maintenance to the leased premises, including the roof, without cost

to the center, and the center assumed all other maintenance and repair costs, including the replacement of broken glass. Each party was to provide fire and extended insurance coverage to protect its respective interest. Liability insurance was the responsibility of the center.

On April 10, 2000, the housing authority adopted Resolution 2000-06 authorizing its executive director, pursuant to General Statutes § 8-50, to acquire the property at 81 Overlook Terrace by eminent domain. This was followed on July 28, 2000, by the filing with the court clerk of its statement of compensation, together with its total deposit of $250,000. The clerk's certificate of taking was recorded on August 14, 2000, in the Hartford land records, thereby completing the taking of the subject leasehold under the provisions of § 8-130, which, as indicated previously, provides that "[u]pon the application of any person claiming an interest therein the Superior Court, or any judge thereof, after determining the equity of the applicant in the deposit, shall order that the money so deposited or any part thereof be paid *forthwith* for or on account of the just compensation to be awarded in the proceeding." (Emphasis added.) The timeliness of such payment of the amount on deposit with the clerk is mandated by the restriction under § 8-130 that "[i]nterest shall not be allowed in any judgment on so much of the amount as has been deposited in court."

The clerk's certificate of taking of the center's leasehold was recorded, as indicated previously, in the Hartford land records on August 14, 2000, thereby vesting full fee simple title to the property at 81 Overlook Terrace, Hartford, in the condemnor, or the housing authority, and vesting the right to just compensation in the condemnee, namely, the center. By stipulation of the parties, a stay of execution for possession was granted until November 8, 2000.

An appeal and application for review of statement of compensation was filed on December 12, 2000. As the only party claiming an interest in the deposit filed with the court, the center moved for its payment under the terms of § 8-130. The housing authority objected to its release on three grounds. First, the housing authority alleged that it believed that the sum of $250,000 was adequate to compensate the center for its leasehold interest and that this amount was deposited as settlement for all claims. Second, the housing authority alleged that the center has refused to accept the aforementioned sum as a final settlement and seeks to have the funds released while it pursues other remedies with the housing authority's funds. Third, and finally, the housing authority alleged that payment of the deposit would be prejudicial to its interest. On January 22, 2001, after finding that the housing authority had an interest in the deposit and any release "would be prejudicial to the [housing authority's] position," the court ordered that "no compensation be released to the [center] prior to a settlement or judgment in this matter."

A motion to dismiss the appeal for lack of jurisdiction over the subject matter for failure to comply with General Statutes § 8-132 was filed by the housing authority, which cited *Bristol* v. *Milano*, supra, 45 Conn. Sup. 605, and contended that an aggrieved person should file a civil action separate from the filing of the deposit in court. In *Bristol* v. *Milano*, supra, 607, the clerk of the Superior Court placed the appeal in the same file as the statement of compensation. "Here, [the housing authority] solely submitted itself to the jurisdiction of the court in order to procure the certificate of taking necessary to complete the eminent domain process. Once the certificate of taking was issued and recorded on August 14, 2000, the eminent domain case was concluded. . . . [The center] is purporting to *appeal* the amount of compensation in this case. [The housing

authority] determined the amount of compensation it deemed adequate and deposited that sum with the clerk of the Superior Court. There was no administrative hearing or judicial proceeding which determined the sufficiency of the amount. No trial record has been developed. Although [the center] is purporting to appeal the deposit amount, it is *actually seeking a trial de novo.* Further, mere notice of an application of review does not constitute a judicial or administrative determination of the deposit amount. There cannot be an appeal without a trial record by which a judicial review can be determined. [Given that] there has been no such trial record or administrative determination, there is no proceeding to review." (Emphasis in original.)

The court denied the motion to dismiss on March 19, 2001, with only the following articulation: "Procedure proper per *Killingly* v. *Wells*, 18 Conn. App. 508, 513–14 [558 A.2d 1039] (1989). See also Memo on Condemnation Policies, from Judith D. Stanulis, dated March 31, 1997 annexed to #113."

On February 20, 2001, the center moved for reconsideration of its motion for payment of deposit, emphasizing that portion of § 8-130 which provides that the court, "after determining the equity of the applicant in the deposit, *shall* order that the money so deposited or any part thereof be paid forthwith *for or on account of* the just compensation to be awarded in the proceeding." (Emphasis in original.) Since it is undisputed that the housing authority does not claim that any other person has any equity in the deposit, "the court must find that the [center] is entitled to the entire deposit." Under the provisions of § 8-130, it is mandated that under the circumstances presented here, the court shall order the requested payment. "There is no requirement that the [center] accept said deposit in full payment or settlement of any sort whatsoever." Likewise, the use to

which the center might put the funds at issue is irrelevant, there being no condition or restriction upon their use. The court again denied this motion on March 8, 2001.

On March 13, 2001, the center moved for reference of the appeal to a judge trial referee. Before it was heard, on March 22, 2001, the housing authority moved to strike the center's appeal for failure "to articulate with specificity the form of relief it sought." This was denied on April 10, 2001. Also on March 22, 2001, the housing authority objected to the motion for reference to a judge trial referee. Upon denial of this objection, the reference to a judge trial referee was made on August 6, 2001.

After reference of this proceeding to a judge trial referee, the center, on August 16, 2001, moved for further reconsideration of its motion to a judge trial referee for payment of the court deposit. As it did on two occasions previous to the reference, the housing authority again objected to payment of the deposit or any portion thereof to the center. After reviewing the entire lengthy record and the housing authority's objections, the judge trial referee this time, on August 23, 2001, granted the motion and ordered payment of the $250,000, held by the court without interest, to the center under the provisions of § 8-130.

On August 22, 2001, the housing authority filed its answer to the center's appeal, denying only the alleged aggrievement by the statement of compensation. As a special defense, the housing authority raised the following three allegations. First, although the sum deposited by the housing authority represents the market value of the leasehold, the center is not entitled to the market value, but rather, to just compensation. Second, in the circumstances of the present case, the center has suffered no monetary loss, other than moving costs, as a result of the taking. Third, and finally, it would be

inequitable if the center received the entire sum deposited. The center moved to strike the alleged special defense as not constituting a legal special defense. The court granted this motion to strike on September 4, 2001, finding that the allegations of the housing authority did not constitute a legal special defense to the center's appeal and application for review of compensation.

The leased premises, known as 81 Overlook Terrace, consist of a one-story masonry medical office building containing approximately 4800 square feet of gross building area. The building was constructed on a slab in 1985 and is attached to the housing authority's community center at 91 Overlook Terrace for the purpose of furnishing convenient medical and dental services to its tenants and the neighborhood. The building is located in an R-3 zone in compliance with its use and other requirements. It is an integral part of the Charter Oak Terrace Housing Development, operated by the housing authority near the easterly terminus of Overlook Terrace, a circumferential road enclosing the housing project at its easterly and southerly borders. There is ample parking for employees and patients adjacent to the structure. The leased premises are located on the westerly side of Overlook Terrace in an area formerly known as the Charter Oak ABC housing project. The housing authority has demolished all residential structures in the ABC sections of the project, leaving the land vacant.

The building was designed to be a community health clinic serving the Charter Oak Terrace and adjoining Rice Heights housing projects and surrounding areas of the city. The building is divided into two sections. The westerly portion of the medical office building houses the administrative functions, while the easterly portion contains the examination rooms, treatment rooms, dental facilities and X ray rooms. The building

has a combination gas and electric heating, ventilation and air conditioning system, 200 amp electrical service and facilities, and is completely fitted with sprinklers for fire protection. The floor plan and design is functional and operational as a health clinic with medical and dental facilities. It was designed in accordance with the lease agreement between the parties to be a community health service facility. Numerous upgrades over the years of its operation have maintained the functional utility of the facility.

The court finds that the highest and best use of the leased premises is for its continued use as a community or local health clinic with full medical and dental service facilities.

The center's appraiser, Richard F. Hagearty, developed his appraisal of the leasehold in two parts. The first portion was the nonamortized construction cost contribution of the lessee totaling $210,750 that was made at the inception of the lease. He amortized this sum over the length of the entire lease of thirty years at $7025 per year. Hagearty appraised the nonamortized construction cost for the remaining 14.25 years of the lease term after the taking at $100,106. Using the rentable building area of 4106 square feet, Hagearty calculated the present worth of the remaining fifteen years of the term, based upon the cost to obtain comparable lease space in today's market as follows. The first five years were calculated at $12 per square foot, the second five years at $13.20 per square foot and the final five years at $14.50 per square foot, which, when discounted at 8 percent per annum, totaled $435,347. The total combined damages were calculated to be $535,453, rounded to $535,500.

The housing authority's appraiser, Dean C. Amadon, found the market value of the leasehold estate of the subject property to be $231,500, the amount deposited

in court for its condemnation by the housing authority. In Amadon's opinion, the total economic life of the building was thirty years, leaving a remaining life of fifteen years. The court finds that this opinion is an underestimate of the total and remaining economic life of the building leased. The court also disagrees with Amadon's conclusion that the highest and best use of the subject property is for commercial development.

Amadon considered the income capitalization method to be the only approach applicable to determine the value of the leasehold estate. The tenant or property owner provided no detailed income and expense information. Amadon stated that sufficient market data pertaining to rental rates, vacancy and collection loss, and operating expenses were available to develop a reliable estimate of net operating income for the subject property.

Current comparable rentals of office and industrial buildings located in close proximity to the subject were utilized, anticipating that the subject property, depending on the eventual development of sections ABC of the project, could be a commercial or an industrial use. After an analysis of comparable rents in the marketplace and a review of the present and historical rent schedules, Amadon found that the fair market rent that can be expected for the subject property is $8 per square foot "triple net," which he defined as a rental where the tenant pays all of the owner's expenses, except those for structural repairs. A triple net lease or rental is not before this court. Based upon his analysis of interest rates and yields, Amadon selected an equity rate of 30 percent as reasonable for what an investor would consider as a potential return on equity for a property similar to the subject.

For the purpose of his analysis, a blended discount rate of 15 percent was used in developing the discounted cash flow analysis. Assuming that the holding

period would be for the remaining fifteen years, and that the income stream would remain constant, Amadon estimated the value of the leasehold by the income capitalization approach to be $231,496.84, rounded to $231,500, the amount of compensation for the leasehold taken filed in court on July 28, 2000, as part of the required statement of total compensation of $250,000.

The housing authority's concluding argument in the present appeal states: "The [center] has suffered no monetary loss other than moving expenses for which it should be compensated. Should the Court choose to award the [center] the fair market value of the leasehold estate in addition to its moving costs, the appropriate value should be $231,500 based upon [Amadon's] appraisal of fair market value. There is no justification to provide the [center] with a windfall at the expense of federal taxpayers from which the [center] receives its funding."

Holders of a leasehold "have such an interest in property as to be classed as 'owners' in the constitutional sense, and are entitled to compensation for the taking of their interest." 2 P. Nichols, Eminent Domain (3d Ed. Rev. 1999) § 5.02[6], p. 5-94. "In determining the compensation to which a lessee is entitled it is necessary to compute the value of the use and occupancy of the balance of the lessee's term. This value should take into consideration the effect thereon of the lessee's right of renewal, if any, and deducting from it the agreed rental which the lessee would have paid pursuant to the terms of the lease." 4 P. Nichols, supra, § 12D.01[3][j], pp. 12D-46 through 12D-47, citing *Gigliotti* v. *Wood,* 175 Conn. 243, 397 A.2d 1342 (1978); *Slavitt* v. *Ives,* 163 Conn. 198, 303 A.2d 13 (1972); *Barnini* v. *Sun Oil Co.,* 161 Conn. 59, 283 A.2d 217 (1971); *Canterbury Realty Co.* v. *Ives,* 153 Conn. 377, 216 A.2d 426 (1955).

"For a leasehold to suffer damages, it must have a value. Generally a leasehold has a value if the fair market value of the property, sometimes called economic rent, is in excess of the rent reserved in the lease. *Canterbury Realty Co.* v. *Ives*, [supra, 153 Conn. 382]. In the case of a total taking of property, the accepted method of assessing damages to the leasehold is to determine the annual difference between the contract rent and the economic rent, to multiply the annual difference by the number of years left under the lease, and then to discount that sum to determine its present value. *Slavitt* v. *Ives*, [supra, 163 Conn. 208]; *Barnini* v. *Sun Oil Co.*, [supra, 161 Conn. 64]." *Gigliotti* v. *Wood*, supra, 175 Conn. 246. "In a determination of what the damages should be, all elements legitimately affecting the value of the lease should be considered." *Barnini* v. *Sun Oil Co.*, supra, 64.

"Under our law, a [judge trial] referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of [the Supreme Court] with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Internal quotation marks omitted.) *Minicucci* v. *Commissioner of Transportation*, 211 Conn. 382, 388, 559 A.2d 216 (1989); *Birnbaum* v. *Ives*, 163 Conn. 12, 21–22, 301 A.2d 262 (1972); *Feigenbaum* v. *Waterbury*, 20 Conn. App. 148, 153, 565 A.2d 5 (1989). It is his task "to reach a result that [gives the plaintiffs], as nearly as possible, a fair equivalent in money as just compensation for the [property] taken . . . ." *Mathis* v. *Redevelopment Agency*, 165 Conn. 622, 623, 345 A.2d 33 (1973); *Feigenbaum* v. *Waterbury*, supra, 153–54.

In the performance of this duty, based upon all the circumstances, due consideration of the evidence and the opinions of expert witnesses, general knowledge of the elements constituting value, and a viewing of the property and surrounding areas, the court finds the value of the subject leasehold should be determined as follows.

First, the value on taking of the remaining term of 14.25 years is predicated upon a fair market value, or economic rent, of $12 per square foot for the first five years of a fifteen year lease, $13.20 per square foot for the second five years, and $14.50 per square foot for the final five years, of 4106 square feet of usable space, discounted at 8 percent per annum, which totals $401,131.

Second, although the terms of the lease provided that the center's occupancy for a total term of thirty years was to be without payment of rent to the housing authority, this was a consequence of the center's nonrefundable contribution of approximately one half of the cost of construction of the building to be rented, but owned solely by the housing authority, in lieu of rental payments for the full term of the lease.

Third, the center's nonamortized contribution to the construction cost in the amount of $210,750 for thirty years, or $7025 per year for 14.25 years, totaled $100,106, constituting the center's rental equivalent payment for the remaining term of its lease.

Fourth, and finally, the difference between the fair market value, or economic rent, of $401,131, and the center's rental equivalent payment for the remaining term of $100,106, or $301,025, is the value of the center's leasehold at the date of taking on August 14, 2000.

Of the total deposit of $250,000 made in court by the housing authority on the initiation of its condemnation

of the center's leasehold, the amount of $18,500 was "for moving expenses and non-removable fixtures." At the hearing before this court, this payment was overshadowed by the evidence and appraisals pertaining to the valuation of the center's leasehold. The only relevant evidence established the center's third party contractual expenses totaling $3600 and undetermined institutional personnel costs associated with moving to another location. The nonremovable fixtures admitted to exist by the housing authority in its statement of compensation were not identified in the evidence.

A review of the pleadings in the present proceeding discloses that the payment of $18,500 "for moving expenses and non-removable fixtures" was not contested by the center. The center's appeal and application for review of statement related solely to the payment of $231,500 for "[a] written leasehold interest in property commonly known as 81 Overlook Terrace, Hartford, Connecticut."

The center's acceptance of the housing authority's payment of $18,500 for moving expenses and nonremovable fixtures is confirmed and approved.

Judgment may enter for the center in the amount of $319,525, less $250,000 previously paid, or an excess of $69,525, with interest at the rate of 8 percent per annum on such excess from the date of taking on August 14, 2000, to the date of payment, together with costs and a reasonable appraisal fee of $2550.