[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding is an appeal from the assessment of damages by condemnation that has come to the court on the wrong procedural track, to which it had been directed by the court clerk on instruction from the CT Page 15073 Civil Court Manager of the Court Operations Division. Instead of being entered on the court records as a separate civil action with payment of the entry fee required by General Statutes § 52-259, this appeal and application for review of statement of compensation was filed, without payment of the statutory entry fee, as a further pleading in the above-numbered and titled court docket previously created for the deposit with the clerk of the Superior Court of the assessed damages in the amount of $1,400,000. See City of Bristol v. Sebastiano A. Milano etal., 45 Conn. Sup. 605.
On July 7, 1998, the Town Council of the Town of Newington duly voted to acquire the hereinafter described property of the Estate of Frederick J. Young in order to implement a land preservation plan. In so voting the Town Council determined that the welfare, convenience and necessity of the town required the taking of such property to enable it to preserve the recreational potential and open space character of the land which adjoins school property within the town, and to preserve diminishing open space in the southwest part of town.
The property taken pursuant to this authority on January 20, 1999, consisted of a certain piece or parcel of land, with the buildings and improvements thereon, located in the Town of Newington, commonly known as "The Young Farm," being and lying on the easterly side of Church Street, and more particularly bounded and described as follows:
NORTH by lands now or formerly of the Estate of J.C. Luce, and Joseph Yurevich, partly by each;
EAST by lands now or formerly of the Estate of Joseph Brown, Salvatore Erisa and Sebastiano Buscemi, and Ignatz Pfister, partly by each;
SOUTH by lands now or formerly of the Estate of Fred Gleineman, Ignatz Pfister, Gustave Lotz, and R.H. Irwin, partly by each; and
WEST by land now or formerly of R.H. Irwin, and by Church Street, partly by each. Said parcel contains 53.86 acres, more or less.
The owner has appealed under the provisions of General Statutes §8-132. In the adjudication of this appeal and review of statement of compensation, the court heard evidence, including the testimony of witnesses, examined appraisal reports and other documentary evidence, and viewed the subject property, its surrounding area and comparable developments referred to in testimony.
The genesis of this proceeding is found in the town records. One of the last large open tracts of single family zoned land in Newington, an CT Page 15074 attractive residential suburb of Greater Hartford located between the cities of Hartford and New Britain, its certainty, and even beginning, of residential development became the concern of the town authorities. On June 26, 1998, the Town Director of Finance, William J. Hogan, furnished to the Town Manager at his request an open space cost benefit analysis concerning the subject property. This study assumed a 70 single family home development. This number of potential lots was furnished to him by the Town Planner, Edward Meehan. The analysis showed that for every $1.00 raised from property taxes, it would cost the town $1.34 in service for an annual loss in the first year of approximately $96,858. Very shortly thereafter, on July 7, 1998, the Town Council adopted Resolution No. 98-90 authorizing the purchase of "The Young Farm."
The significant findings expressed in the preamble to this resolution were as follows:
"WHEREAS, it is hereby found and determined that a parcel of land owned by the Estate of Frederick Young and situated on the east side of Church Street containing 53.86 acres, more or less, has:
a. Significant recreational value in that it is the last large parcel of open space in the southwest area of town and abuts on a portion of land owned by the Town of Newington, on which is contained both the Paterson and Wallace schools; (emphasis added.) and
b. Significant topographic conservation and natural resource value in the preservation of wetlands and the fact that Rock Hole Brook divides the parcel; and
"WHEREAS, the acquisition of the property will:
a. Maximize open space preservation;
b. Protect view corridors, natural vegetation, land forms and other features; and
c. Expand recreational opportunities within the town."
The town's findings and reasoning behind the purchase of the subject property and its description in the resolution demonstrate and confirm the adaptability of the Young property for imminent development. The authorized payment of $1,400,000 for the property was based upon an undisclosed land valuation. The taking is not contested by the owner on constitutional grounds, but merely on the amount of damages paid.
The Young property is a desirable property for residential CT Page 15075 development. It is located in an ideal setting for single family homes. It has considerable frontage on Church Street which permits the development of seven lots on the established town street with no road costs and minimal utility connection expense. Its northern and easterly boundaries are heavily screened by trees. Its southerly portion, through which a Metropolitan District Commission (MDC) sewer easement runs, is buffered almost completely from neighboring homes by trees and a brook. The entire tract is favored by immediately accessible utilities, including a sanitary sewer line. Its former use as a farm would require minimal site work for residential development.
After the decease of the owner, his estate marketed the farm for development as a residential subdivision within the R-20 zone. On August 22, 1996, an agreement was entered into by the estate, as seller, and Ravenswood Development Corporation, as buyer, for the sale and purchase of the entire tract of 53.86 acres, more or less, at the price of $1,957,500, for a residential development of at least 60 one-half acre lots (20,000 square feet minimum). The sale was to take place in three phases of 20 lots each, for successive payments of $667,500, $645,000, and $645,000. This agreement was contingent upon (1) town subdivision approval; (2) use of the MDC existing sewer line; (3) an acceptable environmental assessment; and (4) approval of the Newington Probate Court. A partial deposit of $5,000 was paid in escrow upon the execution of the agreement. An additional deposit of $45,000 was payable in escrow after probate court approval. This agreement was recorded in the Newington Land Records on August 29, 1996.
The agreement of sale was approved by the probate court on the day of its execution. Before payment of the further deposit, an appeal was taken from the probate court order by one of the estate beneficiaries. To extend the agreement for sixty days beyond the final determination of the intervening appeal, an addendum to the original agreement was executed on November 21, 1996. This further agreement stipulated: "The parties agree that SELLER (sic) may make this additional deposit [$45,000] at any time that the Appeal or any subsequent Appeal is pending. Provided, however, at any time during the Appeal or any subsequent appeal to the Connecticut Appellate or Supreme Court, BUYER shall have the right to terminate this Agreement, by written notification to SELLER or SELLER'S attorney and upon SELLER'S receipt of such notice, BUYER shall be entitled to obtain the immediate return of all deposit monies paid hereunder, together with interest earned thereon. After SELLER returns said deposit monies and interest, the parties shall have no further obligation, each to the other, under the terms of this Agreement." Finally, during the extended time for performance of the original agreement, the buyer was to make an application thereunder to the Newington Inland Wetlands Commission, thereby beginning the process for approval of the contemplated CT Page 15076 subdivision by that and other required agencies. The parties also agreed that time is of the essence for the purposes of the agreement. After its execution, this addendum was also recorded in the land records.
The town began this eminent domain action under General Statutes §48-6 by filing its statement of compensation, dated July 9, 1998, and deposit with the clerk of court on July 24, 1998, and notifying the property owner and other parties having a record interest therein. Ravenswood Development Corporation on July 21, 1998, applied to the court for a temporary injunction to enjoin the condemnation. Among the reasons specified for an injunction, the corporation alleged that the town undertook the condemnation in bad faith for the primary purpose of halting the residential subdivision proposed in its agreement of purchase dated August 22, 1996. Finding that the Newington Town Council on July 7, 1998, unanimously approved the proposal to acquire the premises for the purpose of preserving open space, the court denied the application for a temporary injunction. Ravenswood Development Corporation v. Town ofNewington, Superior Court, Judicial District of Hartford No. CV98-0581791 (December 17, 1998). On January 27, 1999, this action was withdrawn from court. Before the withdrawal of its injunction action, Ravenswood filed its appearance in the above-entitled eminent domain proceeding seeking damages.
The Estate's appraiser, Stephen P. Smith, developed a comprehensive analysis and appraisal of the subject property. He described the site as located in the south-central section of town within a residentially developed area featuring a mix of attractive residential neighborhoods. This general location of town is undergoing development activity and very few parcels of viable residential land remain available for development. The subject location also features good proximity to public schools and a Catholic church. Non-residential support uses and commercial developments are focused along the Berlin Turnpike, within one mile east of the subject property. The town of Newington is a densely developed suburban community bounded on the northeast by the city of Hartford and on the southwest by the city of New Britain.
The town is the hub of highways extending to all points of the compass making it easily accessible from the cities and towns surrounding it. State Route 9 is a multi-land highway that runs north and south through the northwest corner of Newington and connects with Interstate 84 approximately one and one-half miles north of the Newington town line and with Interstate 91 about ten miles to the southeast. The Berlin Turnpike, also known as Routes 5 and 15, which runs north and south from Massachusetts, traverses the southeast corner of the town. The highway system in Newington provides good regional mobility and ready commuter access for living, employment and shopping, as well as to the core cities CT Page 15077 of Hartford and New Britain.
Newington housing and subdivision activity favors the supply side of market factors. The limited inventory of available residential acreage for new subdivision development has reduced the availability of new construction alternatives for prospective consumers. Sales activity within the upper price ranges exists to stimulate and support new home construction at price levels attractive to developers.
The property features exceptionally efficient physical characteristics in support of future development. The site features direct access to a full complement of public utilities and municipal services, including a sanitary sewer trunk line which has been installed within the tract. Overall physical characteristics are also amenable to single-family residential building lot yield as the site features exceptionally favorable topographic contours, including large unified sections of developable acreage. After viewing the site and its surrounding areas, including nearby Berlin Turnpike, the court confirms this description of the subject property.
The subject property has sufficient land area, road frontage and configuration to support further subdivision in compliance with zoning regulations. As of the date of taking, complete subdivision approvals had not been approved. A partial subdivision consisting of seven lots fronting on Church Street had previously been approved. This partial subdivision, along with a full subdivision proposal of the entire acreage which had been contemplated by the proposed sale to Ravenswood Development Corporation, were voided by the town's eminent domain proceedings now before this court.
The property is situated within a Residential R-20 zone, which requires a minimum lot size of 20,000 square feet, commonly called a half-acre lot. The appraiser's analysis of other approved subdivision developments in the vicinity indicate a reasonable and expectative subdivision yield for the site would be seventy single-family building lots. His conclusion from these findings is that the highest and best use for the subject land would be for development as a conventional single-family residential subdivision conforming with applicable zoning and subdivision regulations. The court agrees with these findings and conclusion.
For tax purposes the subject property is classified as farm land under the provisions of General Statutes § 12-107c with a total assessment on the grand list of October 1, 1998, of $165,450. The town of Newington underwent its last statutory revaluation as of October 1, 1991. The fair market value at that time was $1,032,540. Its assessment based on that estimate was $722,780. "[T]he general rule is that assessed valuations CT Page 15078 made without the participation of the owner, as is the case in Connecticut; General Statutes § 12-64; are not usually admissible on the issue of the value of property taken by eminent domain." ConnecticutPrinters, Inc. v. Redevelopment Agency, 159 Conn. 407, 415; SorensonTransportation Co. v. State, 3 Conn. App. 329, 332. While this assessment is not evidence of valuation of the subject property, it does indicate that the property has a fair market value far in excess of that indicated by its farm land assessment.
"The concept of highest and best use, chiefly employed by appraisers as a starting point in estimating the value of real estate, concerns the use that will most likely produce the highest market value, greatest financial return, or the most profit from use of that property." Robinsonv. Westport, 222 Conn. 402, 405-406, 610 A.2d 611 (1992). The question of the highest and best use of property is a question of fact for the trier. Greene v. Burns, 221 Conn. 736, 748; South Farms Associates Ltd.Partnership v. Burns, 35 Conn. App. 9, 16.
"Evidence of the special adaptability of land for a particular purpose is properly admitted if there is a reasonable probability that the land could b e so used within a reasonable time and with economic feasibility. The fair market value of realty is determined in light of the use to which it is being put at the time of the taking or to which it could be put most advantageously." Transportation Plaza Associates v.Powers, 203 Conn. 364, 375-76 (Citations omitted). "Proof of the reasonable probability that land could be put to a particular use need not be established by the testimony of the particular administrative officials involved." Transportation Plaza Associates v. Powers, supra, 377.
The highest and best use of the property at the time of the taking, in the opinion of the owner's appraiser, was its residential development as a conventional subdivision of 70 single-family building lots. That would be the maximally productive highest and best use of the subject property. It is the keystone of valuation of property. In determining the market value of a piece of real property for the purposes of a taking by eminent domain, it is not merely the value of the property as it is used by the owner that should be taken into consideration. The possibility of its use for all purposes, present and prospective, for which it is adapted and to which it might in reason be applied, must be considered. Its value for the use to which men of prudence and wisdom and having adequate means would devote the property if owned by them must be taken as the ultimate test. 4 P. Nichols, Eminent Domain (3d Ed.) § 12B.12, p. 12B-89.
Any potential use of the land will be considered in the evaluation of CT Page 15079 the property. Although condemned property is not to be valued as part of the proposed improvement, when the condemnee's proposed use is one of the highest and best uses of the property but, due to zoning restrictions, the property is not presently available for that use, the condemnee is entitled to show the probability of a zoning change and its effect on market value. The potential use value must be reasonable, and within the realm of possibility in the not too distant future. The property must be available for the potential use asserted, and adaptable for the particular purpose. 4 P. Nichols, supra, § 12B.14, pp. 12B-137 — 142. The court agrees with the appraiser's conclusion and finds that the highest and best use of the subject property under consideration was as a residential subdivision development with a possible configuration of fifty-five to seventy conforming lots.
Of the three recognized approaches to value, cost, income capitalization and sales comparison, the owner's appraiser used only the sales or market approach. The cost and income capitalization approaches were not appropriate because the subject property consists of unimproved land without final approvals for development in place. The six comparable sales utilized were of recent date, 1997 to 1999, and were analyzed primarily on the basis of sale price per raw lot, consistent with the lot yield analysis for the subject property.
The first sale considered consisted of 11.05 acres on Willow Street, Wethersfield, with a yield of twenty-one lots for high quality single-family homes of 2,700 to 2,900 square feet on each lot targeted for a price range of $300,000-$345,000. The overall house price package is projected to include an approximate lot value of $95,000. The second sale considered consisted of 7.98 acres on Meadow Lane, Berlin, with a yield of 16 lots for homes that sold for approximately $250,000. The contributory value of the finished lots was $80,000. The third sale was nearby Barn Hill Acres, Deming Street, Newington, viewed by the court. This property consisted of 75.14 acres with a yield of ninety-two lots. Four phases of subdivided lots were subsequently approved from 1997 through 1999. The development is about 50% complete with homes selling from $240,000 to $315,000, but one vacant lot sold for $95,000.
The fourth sale compared was Melanie Estates, Richard Street, Newington, adjacent to the southeast portion of the subject property, also viewed by the court. This consisted of 20.46 acres yielding thirty-one lots for a raw lot price of $24,210. Prices for finished homes ranged from about $200,000 to $250,000 and virtually all have been sold. Only one finished lot was sold in 1998 for $58,000. The fifth sale compared was located in Wallingford. This consisted of 60.71 acres with a yield of seventy-nine lots. The purchase price was $2,115,000, or $26,772 per raw lot price. Subsequent to the granting of subdivision approvals, CT Page 15080 the purchaser marketed the approved subdivision to a developer/contractor in the sixth comparable sale for $2,903,000, or raw lot price of $36,747. Approximately 30% of these new homes were sold within eighteen months of acquisition for $205,000 to $280,000.
In his analysis of these sales data, the appraiser gave most weight to the unit price ranges demonstrated by sales 1, 2, 4 and 6. The upward end of the range reflects land transactions with subdivision approvals in place. In the subject case, the land would be, and was, marketed subject to subdivision contingencies by the grantee and downward adjustment from the high end of the unit price is considered reasonable. Land sale 4 strongly compares to the location elements of the adjacent subject property, and upward adjustment is indicated to reflect the advanced date of sale and the superior development efficiency of the subject land. Based upon his analysis, it is the opinion of the owner's appraiser that the most appropriate unit value range applicable to the subject property is estimated to be $30,000 to $32,000 per potential lot. Seventy potential lots at these values results in a total fair market value of the subject property to be. $2,100,000 to $2,240,000. Based upon this value range, his estimated market value of the property is $2,200,000.
In his post-correlation of the valuation, the appraiser equates his conclusion to a unit value of $31,428 per potential raw lot. Unit sale prices per raw lot are compared as a percentage of raw house sale price levels within the development. Within Newington, new homes within the active subdivisions are currently achieving prices approximating $250,000 to $300,000. In his opinion, the likelihood exists that an appropriately developed subdivision format could market well built, quality residences priced within the range of $250,000 to $275,000. A prospective developer would consider this retail price potential when evaluating the prospects for purchasing the subject land. The market-oriented ratio which would apply to the subject land/lots is estimated to be 11.5% to 13.0% of market price ranges for potential new homes. The subject unit value estimated at $31,428 per raw lot is near the low end of his indicated development ratio range. His value conclusion based upon raw lot unit of comparison was considered to be market-oriented and reasonable.
The value estimates of appraisers for the town and Ravenswood range from $1,220,000 to $4,335,000. They agree, however, with the owner's appraiser in these relevant factors: (1) the highest and best use of the property is as a residential R-20 subdivision; (2) it is likely that the property would be marketed to a single purchaser for development; (3) the market for the property at the time of taking was good; (4) the property is desirable, attractive, and relatively easy to develop; (5) utilities were readily available to the site; and (6) wetlands separated a small portion of the property making that area accessible only through the CT Page 15081 adjacent Melanie Heights subdivision noted in the aforementioned comparable sales. The differences in valuation result from two factors: (a) the number of lots the subject property is likely to yield; and (b) the value of each potential lot.
The town's appraiser, Dean C. Amadon, valued the property as of December 28, 1998, considering that as the date of taking. He found the highest and best use of the subject property was as a residential subdivision. In his letter of transmittal, the following assumptions were noted: "It is our understanding that this report is to be used to aid in and/or support decisions relating to financing for the subject property. This appraisal report is likely to be used in a litigated matter. The property being appraised consists of 53.86 acres that have the potential for a 55-lot, single-family residential subdivision. . . . These 55 building lots are assumed to be approved but not improved in that no foundations or roads have been started. At this time, it is unclear whether the development will be built and sold as individual building lots and/or residential packages. For valuation purposes, we will consider that packages will be sold."
Based upon a sales comparison approach, he found the value of the subject property to be $1,220,000. In his "Comments," he stated: "After discussions with the Newington zoning officials, the appraisers are of the opinion that the subject property could meet the zoning and subdivision requirements for a 55-lot subdivision." In his testimony he specified that this number of potential lots was based on a conversation with the Town Planner, Edward Meehan. The court notes it was established that earlier the town planner had advised the town director of finance in connection with the latter's cost benefit analysis for the town manager relative to the purchase of this property that seventy lots could likely be developed on the site, and this was the number used in the reported analysis that led to the town's condemnation of the Young property. It is also observed that Amadon neglected to acknowledge the existence of the recorded Ravenswood purchase agreement and addendum. The town's appraisal of $1,220,000 equates to a unit value of $22,182 per potential raw lot. This unit value extended to a seventy lot subdivision would increase this estimate of property value to $1,552,740.
While Amadon considered the sales comparison approach the only appropriate method of estimating the present market value of the subject property, he also used this approach to corroborate the value indicated by the subdivision analysis approach. This subsidiary analysis uses elements of the income capitalization approach. This form of income capitalization used yield capitalization through discounted cash flow analysis that forecasts revenues and expenses over the period necessary to dispose of the individual vacant finished residential building lots as packaged CT Page 15082 lots. He reconciled this conclusion by using the sales comparison approach. His estimated value by the subdivision development analysis was $1,220,000.
In his first comparable sale, Amadon used the Barn Hill Acres subdivision in Newington. This was the third comparable sale utilized by Smith in his valuation for the estate. With partial approval of seventy lots, Amadon found the sale price of an approved lot to be $20,714. His second comparable sale was Melanie Estates, the subdivision adjoining the subject property on the southeast and the fourth comparable used by Smith. With the approval of thirty-four lots, he found the sale price of an approved lot to be $22,074. After a slight negative adjustment for physical characteristics, this lot value was reduced to $22,068. Referring to the Young farm, he estimated the market value of a lot to be $20,714 to $22,068, most probably to sell at $22,000 per lot. Fifty-five lots, therefore, would give an estimated value by the sales comparison approach of $1,210,000. His final estimate of value after this two-fold approach was $1,220,000.
The proceeding before the court is a textbook case. Its unusual and extraordinary facts are provocative and challenging to the trier. The condemnation of the subject property by the town was provoked by the anticipated subdivision development of one of the few large tracts in town historically devoted to its existing agricultural use: Where the land is pure raw land, with no improvements at all having been made, if there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis. Minicucci v. Commissionerof Transportation, 211 Conn. 382, 385. Such cases are decided on their particular facts, giving weight to the surrounding circumstances involved in the particular case. 4 P. Nichols, Eminent Domain (3d Ed.) § 12B.14[1], p. 12B-159.
Four elements must be proven by the landowner before a potential use can be said to have influenced the fair market value of the condemned land: (1) The potential use must not require a substantial expenditure of capital; (2) The project must not be highly uncertain; (3) The property must be physically adaptable to the potential use; and (4) A market for the property must have existed, in fact, at the time of the taking, or must have been reasonably likely to exist in the near future. The trier must find that the property is adaptable and needed or likely to be needed in the reasonably near future for the proposed use. The landowner need not establish the development potential of the property for the proposed use by a preponderance of the evidence, but only that it is reasonably so. The court is to value the tract of land only, and not to determine how it could best be divided into building lots, nor to conjecture how fast they could be sold, nor at what price per lot. Once CT Page 15083 the question as to the adaptability of a condemned tract of land for subdivision purposes has been answered, the real problem as to valuation must be faced. Does it enhance the market value and, if so, by how much. 4 P. Nichols, supra, §§ 12B.14 and 12B.14[1], pp. 12B-151 — 159.
The evidence here is persuasive that the subject property was adaptable for subdivision purposes. First, there was the unanimous opinion in the testimony and reports of all appraisers that the highest and best use of the property was for single-family residential construction similar in size and styles to the homes being constructed in Newington at the nearby Melanie Estates and Barn Hill Acres approved developments. Second, there was the execution of the sales agreement executed on August 22, 1996, by the estate, as seller, and Ravenswood Development Corporation, as buyer, for the sale and purchase of the entire tract of 53.96 acres, for a residential development of at least sixty one-half acre lots. Third, on June 26, 1998, the town itself admitted in its study conducted to analyze the cost benefit of a seventy single-family home development that the property was adaptable for subdivision use. Based on this evidence, the court finds and concludes that the property is adaptable to subdivision development and that there was a need or demand for such use in the near future. Additionally, after viewing the subject property, Melanie Estates and Barn Hill Acres and the surrounding areas in Newington, the court concludes that the Young farm is superior in adaptability and desirability for development than the other two subdivisions now in various stages of construction and sale.
The "lot method" approach to valuation may not be used. The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored, and is too uncertain and conjectural to be computed. In any event, if evidence is offered as to developed value, consideration must be given to the cost of developing that value. 4 P. Nichols, supra, § 12B.14[1][a], pp. 12B-163 — 166. "A condemnee is not entitled to realize a profit on his property. It must go to the condemnor for its fair market market value, as is, irrespective of any claimed value based on an aggregate of values of individual lots in a subdivision which one hopes to sell at a future time to individuals rather than to an individual. The test is not what the lots will bring when and if [sixty to seventy] willing buyers come along, but what the tract, as a unit, and as is, plotted or not, and in whatever state of completion, will bring from a willing buyer of the whole tract." State v. Tedesco, 4 Utah 2d 248, 291 P.2d 1028.
The acceptable rule for the evaluation of the subject property, CT Page 15084 therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to subdivision development. 4 P. Nichols, supra, p. 168.
Under our law, a judge trial referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v. Commissioner of Transportation, supra, 388;Birnbaum v. Ives, 163 Conn. 12, 21-22 (1972); Feigenbaum v. Waterbury,20 Conn. App. 148, 153 (1989). It is his task to reach a result that gives the plaintiffs, as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathis v. RedevelopmentAgency, 165 Conn. 622, 623 (1973); Feigenbaum v. Waterbury, supra, 153-54. In the performance of this duty, based upon all the circumstances, due consideration of the evidence and the opinions of expert witnesses, general knowledge of the elements constituting value, and a viewing of the property, nearby developments in Newington, and surrounding area, I find the value of the subject property to be $2,100,000.
This eminent domain proceeding is without known precedent in our jurisdiction. The extraordinary facts and original issues arising therefrom make the action a singular case with compound issues for resolution. The appeal and application for review of statement of compensation was originally filed by the Young Estate on December 7, 1998. That was followed two days later by the appeal of Ravenswood Development Corporation. Each party, owner of the fee and purchaser of the property under contract of sale with two successive options, respectively, is claiming the compensation award to the exclusion of the other interest in whole or in part. The Ravenswood Development Corporation has asked the court to consider the lost profit on the potential construction of homes at the site because the condemnation of the property foreclosed the development opportunity of the site. It claims that the constitutional requirement of adequate compensation for the taking should necessarily provide compensation not only for the value of the unimproved lots, but also for the value of the lost opportunity to profit from the construction and sale of homes in the residential subdivision.
On August 22, 1996, an agreement was entered into by the estate, as seller, and Ravenswood Development Corporation, as buyer, for the sale and purchase of the entire tract of 53.86 acres at the price of $1,957,500, for a residential development of at least sixty one-half acre CT Page 15085 lots (20,000 square feet minimum). The agreement was approved by the probate court on the same day and recorded one week later on the Newington Land Records. Other contingencies were: (1) town subdivision approval; (2) use of the existing MDC sewer line; and (3) an acceptable environmental assessment. An appeal was taken from the probate court order by one of the beneficiaries. While this appeal was pending, the town commenced its condemnation of the property.
The purchase by Ravenswood was to take place in three phases of twenty lots each, for successive payments of $667,500, $645,000 and $645,000. The first stage of the tripartite purchase began with a partial deposit of $5,000 paid in escrow upon the execution of the contract. The additional deposit in escrow of $45,000 due upon probate court approval was postponed by the appeal from such approval. The balance of the total sum for phase one of $667,000 was to be paid at its closing. For eighteen months after the closing of phase one, Ravenswood had the option of purchasing another twenty lots identified in the contract for the second instalment of the total price. A third option for the remainder of the parcel was available to the buyer for twelve months after the closing of the second phase of twenty lots and two successive options for the purchase of twenty additional lots each of the remainder of the subject property.
The Young Estate contests the claim of Ravenswood under its purchase contract to the damages, or a part thereof, for two reasons. First, Ravenswood does not have a recognized and vested interest in the real estate. Arguably, it contends, a contract to purchase could be compensable if the conditions precedent in the agreement were sufficiently satisfied so that the court could conclude that Ravenswood would have purchased the property at the time of taking. It maintains that the court cannot so conclude here for the following reasons:
1. Ravenswood had not applied for any of the several approvals which were required to subdivide the property. To this, the court finds that the taking precluded the opportunity of Ravenswood to seek and obtain the necessary approvals, which in all probability would have legally been granted.
2. The purchase price of $1,957,500, which was based on a minimum of sixty lots, was subject to increase for every lot obtained over twenty in each of the three phases of the proposed subdivision. Therefore, impermissible speculation is required for the ultimate price. The Young Estate fails to recognize in making this claim that the total contract price would increase by $52,500 for each additional frontage lot approved, and by $30,000 for each additional interior lot approved. Simple addition is not speculation. CT Page 15086
3. Ravenswood was not ready, willing and able to purchase the property on the day of taking. This claim ignores the facts and circumstances of the taking before Ravenswood could go forward in its purchase. The same ruling applies to the alleged lack of evidence showing the financial ability and construction financing of Ravenswood and Richard N. Fiske to complete the purchase.
4. The further claim that Ravenswood would have the right to stop the development process after the first third of the subdivision was created ignores the fact that the Young Estate agreed to this provision in the contract. The same answer applies to the further claim of lack of consideration because Ravenswood was entitled to obtain the full refund of its deposit if it could not obtain development approvals.
5. The final claim that the agreement is unenforceable under the Rule Against Perpetuities, General Statutes § 45a-491, because it contained no provision for a final date by which Ravenswood was required to purchase all the property is also without merit. This claim was previously made during the course of the trial on November 3, 1999, when the Young Estate filed a motion to dismiss the appeal of Ravenswood. After argument, the court denied this motion. The statutory rule against perpetuities is not applicable to the sale and purchase agreement between the Young Estate and Ravenswood. The purchase and options provisions of the contract are valid and binding without regard to the rule against perpetuities.
General Statutes § 47-33a(a) establishes the validity of the agreement and its terms. This statute provides: "No interest in real property existing under an executory agreement for the sale of real property or for the sale of an interest in real property or under an option to purchase real property shall survive longer than one year after the date provided in the agreement for the performance of it or, if the date is not so provided, longer than eighteen months after the date on which the agreement was executed, unless the interest is extended as provided herein or unless action is commenced within the period to enforce the agreement and notice of lis pendens is filed as directed by section52-325."
The exclusion from the rule against perpetuities of the interest of Ravenswood in the property under its purchase agreement is further supported by General Statutes § 49-92a which provides: "A purchaser's lien is created for the amount of the deposit paid pursuant to and stated in a contract for the conveyance of land by the recording of that contract in the records of the town in which the land is situated, provided the contract is executed by the owner and by the vendee of the CT Page 15087 land, witnessed and acknowledged in the same manner as required for a deed for the conveyance of land, and describes the particular land to which it refers. That purchaser's lien shall be prior to any other liens and encumbrances originating after the contract is recorded. A purchaser's lien may be foreclosed in the same manner as a mortgage. Transfer of title of the land to the vendee constitutes a release and discharge of the lien." No purchaser's lien shall continue in force for a longer period than two years after such lien has been perfected, unless the party claiming such lien, within said period, commences an action to foreclose the same and proceeds to final judgment. General Statutes § 49-92c. Under the provisions of General Statutes § 48-21, notice shall be given to encumbrancers of land taken for public use in the same mariner as notice is required to be given to the owner of such property, and the amount due such lienor, "not exceeding the amount to be paid for such property, shall be paid to him according to priority of claims, before any sum is paid to any owner of such property."
Finally, in making this claim the Young Estate overlooks the provision in the sale and purchase agreement addendum of November 21, 1996, that "[f]or all purposes contained in this Addendum, the parties agree that time is of the essence."
The town of Newington was legally authorized to take the Young property by eminent domain. General Statutes § 48-8. The procedure for such condemnation is prescribed in General Statutes § 8-132. General Statutes § 48-12. On December 9, 1998, Ravenswood filed its appeal and application for review of statement of compensation as an aggrieved party under § 8-132. Additionally, under the terms of § 8-132a, on January 26, 1999, it filed a motion for determination of equities and requesting the appointment of a state referee to hear the facts and make a determination of the equities of the parties in the deposit of $1,400,000 in its requested application for a review of the statement of compensation. No action was taken by the court on the motion at that time.
The Young Estate on March 22, 1999, applied for payment to it of the amount of $1,400,000 on deposit. This was granted by the presiding judge on April 19, 1999. In the meantime, on March 26, 1999, Ravenswood moved for a reference of the action to a judge trial referee, which was granted on April 12, 1999. Thereafter, on September 10, 1999, the Young Estate objected to Ravenswood's motion for determination of equities, alleging (1) that Ravenswood had no interest in the property subject to the taking; and (2) that Ravenswood would not have been in a financial position to purchase the property. Ravenswood opposed this objection to its motion for determination of equities. After a hearing, the Young Estate's objection to Ravenswood's motion for determination of equities CT Page 15088 was overruled. On November 1, 1999, trial commenced.
Ravenswood's appraiser, Robert J. Nocera, appraised the fee interest in the property by the sales comparison approach under two scenarios. In the first, he estimated the value of an approved sixty lot subdivision to a single purchaser, with this analysis reflecting the sellout of the subdivision as unimproved single-family building lots. In this appraisal he compared the sales of twenty-one lots in Newington, Rocky Hill, Berlin, Glastonbury, Wethersfield and Southington. After estimating the various costs attributable to the development, he deducted those costs from the projected gross sellout value. From the discounted value of the resulting cash flows, combined with the present worth of the mortgage supportable by those cash flows, he estimated the present value of the subject subdivision to a single purchaser to be $2,475,000, or $41,250 per lot.
On the second scenario, his comparable sales consisted of eight current sales at Melanie Estates and fourteen sales at Barn Hill Acres. The only adjustment he deemed relevant was for the smaller size of the comparable homes. He estimated a typical dwelling of 2,400 square feet in the subdivision on the subject property would sell for $240,000, for a total gross sellout value of $14,400,000. To arrive at the estimated present worth of the subject subdivision to a single purchaser, using the second development process, he estimated the various costs attributable to the development and deducted those costs from the projected sellout value. The discounted value of the resulting cash flows, combined with the present worth of the mortgage supportable by those cash flows, determined his estimate of the present market value of the subject subdivision to a single purchaser under the second scenario to be $4,335,000, or $72,250 per lot.
The Young Estate seeks a finding by the court that the property taken was worth at least $2,200,000, and that at least the additional sum of $800,000 in damages should be paid to it to the complete exclusion of Ravenswood from any portion of the award. Ravenswood, on the other hand, seeks an award of just compensation in an amount equal to or greater than the estimate reached by its appraiser in the mount of $4,335,000, with a further hearing by the court to determine priorities to the amount awarded as just compensation.
The governing rationales applicable to the issues created by the loss of Ravenswood's executory contract of purchase and its two successive options for the purchase of the subject property by the town's taking by condemnation are authoritatively stated as follows: "[A] contract has been made for the sale of land at a certain price which is less than the fair market value subsequently defined as a result of the property being CT Page 15089 acquired through eminent domain. The intending purchaser has made an initial payment but before the date fixed for conveyance the land is taken by eminent domain. The contract is rendered impossible to perform and the purchaser is not entitled to damages from the vendor for his failure to carry out his agreement. The purchaser is entitled to compensation from the condemnor for the taking of his equitable interest in the land. However, if the award is greater than the contract price, the vendor should receive the exact amount for which he had agreed to sell the property and the purchaser should be awarded the balance. This rationale is predicated upon the fact that such an executory contract is considered an assignment of the award to the purchaser who is considered the equitable owner." 2 P. Nichols, Eminent Domain (3d Ed.) § 5.02[3][a], pp. 5-73 — 74.
"[W]here the option is not subsequently exercised, it has been held that the optionee is entitled to compensation for the loss of his right to elect to purchase. Recent legal trends support the conclusion that the owner of an unexercised option to purchase land possesses a property right that is compensable in eminent domain, the measure of damages being the excess, if any, of the total award above the optioned purchase price." 2 P. Nichols, supra, p. 5-77. These are the principles of law applicable to the issues here before the court.
The case of Texaco, Inc. v. Commissioner of Transportation,34 Conn. Sup. 194, is relevant to the facts and issues presented here. After a stipulation increasing the award of damages for the fee from $204,000 to $243,800, the court was concerned with the value of the lessee's interest in the property taken where the lease had not expired and an option to purchase the property had not been exercised at the time of condemnation. The lease had ten plus years to run. It contained an option to purchase the property for $55,000 during the initial term or any extension with the right of first refusal to a bona fide offer. Texaco maintained that the option to purchase, although it was not exercised, had value greater than the value of the lease and that it was entitled to that amount as just compensation under equitable principles of fairness. No Connecticut case had been cited as precedent in that situation.
"The rule for evaluating a leasehold interest in land where there is a complete taking is to be found in Canterbury Realty Co. v. Ives,153 Conn. 377, 382. That rule was followed in Barnini v. Sun Oil Co.,161 Conn. 59, 64. "Every kind of right or interest in property which has a market value must be compensated for in condemnation proceedings.'Canterbury Realty Co. v. Ives, supra, 384. A lease is a contract; Perrucciov. Allen, 156 Conn. 282, 285; which creates an interest or estate in the premises. Branch v. Doane, 17 Conn. 402, 411. An option to purchase is a contractual right which relates to an interest in land and gives the CT Page 15090 option-holder the right to buy the property. Pigeon v. Hatheway,156 Conn. 175, 181, 183. As the option is largely for the benefit of the option-holder it should be construed with that purpose in mind. SinclairRefining Co. v. Allbriton, 147 Tex. 468, 474; Barnhart v. Stern,182 Wis. 197, 199." Texaco v. Commissioner of Transportation, supra, 196.
As the lessee's option to purchase constitutes a right in property, the lessee cannot be divested of it through the medium of condemnation without just compensation. "Under Connecticut law, buttressed as it is by the other cases cited, the lessee, Texaco, Inc., is entitled to judgment in the Texaco case for the excess, if any, of the total award above the optioned purchase price. 2 Nichols, Eminent Domain (1977 Cum. Sup.) p. 20. See also County of San Diego v. Miller, 13 Cal.3d 684, [532 P.2d 139], where there was an option to buy but no lease." Texaco, Inc. v.Commissioner of Transportation, supra, pp. 196-97. Judgment was thereafter awarded to Texaco, Inc., in the amount of the excess of $188,800 over the purchase price as the value of the option. See also,Hartford National Bank Trust Co. v. Redevelopment, 164 Conn. 337, 345
(valuation of restrictive covenants); Slavitt v. Ives, 163 Conn. 198, 208
(valuation of leasehold interest); and Colaluca v. Ives, 150 Conn. 521,530-31 (valuation of option, citing General Statutes § 48-21).
In County of San Diego v. Miller, supra, as cited in Texaco, Inc. v.Commissioner of Transportation, supra, an unexercised bare option to buy the condemned property existed without a lease and its holder was allowed compensation when taken by the government. The measure of damage was the excess, if any, of the total award above the optioned purchase price. Id., 532 P.2d 144. The Supreme Court of California noted that under its Civil Code the option, when recorded, created a cloud on the optionor's title for one year following, a provision not unlike the time limitations concerning real estate contracts contained in our General Statutes §§47-33a and 49-92c hereinbefore cited. Id., 532 P.2d 141.
Since the measure of damage to the holder of an unexercised option to purchase of land taken by eminent domain is the excess, if any, of the total award above the optioned purchase price, a fortiori, the same principle applies, and even more so, to the purchase contract of Ravenswood with two successive options to purchase the property taken by the Town of Newington in eminent domain. Accordingly, the Young Estate is entitled to the purchase price agreed to in its contract with Ravenswood, and Ravenswood is entitled to the excess of damage found in the award from the taking over its contract purchase price, plus the return of its escrow deposit paid to the Young Estate.
The unusual facts and circumstances of this case are further CT Page 15091 illustrated by the claim of one of the beneficiaries of the Young Estate, Edward Young, Jr., for compensation of the value of his growing crops damaged by the taking. On April 20, 1992, a "Farm Lease" was executed between the Estate of Fred J. Young, Jr., as lessor, and Edward Young, Jr., as lessee, of the entire family farm and accessory buildings for a term of eight years, commencing on May 1, 1992, and ending on April 30, 2000, or "sooner if the property is sold." This lease was without the payment of rent, but the lessee was required to submit to the lessor an IRS Schedule F form for its records. The use of the farm was limited to agricultural pursuits, particularly the harvesting of the yearly hay crop and the planting of a vegetable garden for the mutual use of both parties. The lease terminated with the taking of the property by the town on January 20, 1999, in this eminent domain proceeding. A statutory notice to quit possession on or before May 1, 1999, was complied with.
The lessee now seeks the value of the growing crops on his farm as of the date of taking pursuant to General Statutes § 48-14. This law, enacted in 1957, provides that "[w]hen any land is taken in eminent domain proceedings authorized under any provision of the general statutes or any special act, the value of any crops upon the land subject to condemnation shall be taken into account in computing the damage." There were three crops growing at the time of taking: (1) Christmas trees; (2) hay; and (3) raspberries.
In 1991, even before the lease, the lessee planted 2,250 Christmas trees. By credible evidence, about 1,600 trees were standing at the time of taking. They were green, bushy, well-maintained and about six feet tall. Hay was harvested by the lessor on about forty acres continuously since the early 1990's. There were two cuttings of hay in 1998. After the last cutting in October, he reseeded and rolled the field in preparation for the following year. Even in 1999, before the notice to quit possession, he fertilized and rolled the field, but the following crop was taken over and disposed of by the town. In 1998, he harvested 6,346 bales of hay for which he received a gross income of $14,974, or $2.36 per bale. As of the taking date, the lessee was cultivating a raspberry crop on one-half acre of the farm. The raspberry roots were planted in 1996, but no berries were harvested before the taking. A credible farming expert from nearby Plainville testified for the lessee. From his personal experience, he found that it takes at least three years to obtain a harvest of raspberries, and that an average annual net profit from a one-half acre of raspberry bushes would be $6,000. According to the lessee's Schedule F for the fiscal year April 1, 1998-1999, he netted a total farm income of $5,775 from the harvest of hay only.
In evaluating his claim for growing crop damage by the taking in 1999, the lessee asserts that the Christmas tree crop had a market value of CT Page 15092 $47,559. This sum was arrived at by multiplying 1618 trees by $31.50 for the average sale price, then deducting 6% sales tax and $350 cost of maintenance during 1999. For the 1999 hay crop, he claims a net market value of $17,750. For the 1999 raspberry crop, he seeks a net market value of $7,350. The total he seeks for crop damage due to the taking is $72,659.
The town contests the lessee's claim on several grounds. First, it claims that the lease restricted the use of the land, and the cultivation of Christmas trees and raspberry bushes were not authorized. Second, the lease would have expired by its terms in November 2000 (sic) and the Ravenswood option, but for the condemnation, would have been in effect. The lease contained no provision for harvesting the trees or paying for them in the event of the purchase by Ravenswood. Third, as of January 20, 1999, there was no hay to be harvested on the premises. The last harvest, was completed by October 1998.
Noting that there is no judicial interpretation of General Statutes § 48-14, the town relies upon a parallel statute, General Statutes § 16-268, which provides that public service companies shall pay owners of property damages for growing crops destroyed by construction, maintenance and/or repair of a pipeline. The court in Tallmadge Bros.,Inc. v. Iroquois Gas Transmission System, L.P., Superior Court, Judicial District of _____________ (August 14, 1998), (1998 WL 525479), in interpreting this statute, quoted Burke v. Thomas, 313 P.2d 1082, 1089
(1957): "In an action for damages for injury to growing crops, the measure of damages is the value of the unmatured crops at the time of the injury." In Burke, the court went on to rule that "[i]n arriving at such value, it is proper to show by evidence the probable yield under proper cultivation, and the value of such probable yield when matured, gathered, prepared, and ready for sale; also the probable cost of proper cultivation necessary to mature the crop, as well as the cost of gathering, preparation, and transportation to market. The difference between such probable value in the market and the cost of finishing the cultivation, and gathering, preparing and transportation to market, will represent the value at the time of loss."
The town claims that there was no hay crop upon the land at the date of taking and, therefore, no compensation is due for hay. Until the growing season began in the spring of 1999, there was no crop. This argument overlooks what every farmer knows. A growing crop consists of three steps: (1) seeding; (2) maintenance, feeding and fertilization; and (3) harvest. The incompletion of the growing cycle by inability to harvest does not negate its value or make the growing cycle worthless. In this instance, after the harvest of the 1998 hay crop, the lessee reseeded and rolled the field in preparation for the 1999 growing season, and before CT Page 15093 being evicted by the town he refertilized and rerolled the field for the next crop. That crop when matured belonged to the town, which disposed of it without compensation to the lessee for his labor and expense in planting and agriculturally maintaining the crop in its immaturity of growth.
The town next maintains that the Christmas trees were not yet mature and could not have been harvested. This argument is disproven by the town's own assertion of the Burke rule for measuring damages to growing crops. The claim that the growing of these trees was not authorized by the lease is of no weight. That they were planted and maintained without the specific authorization is of no relevance to the town at this time. The Christmas trees were there at the time of the condemnation and the owner of those trees suffered a loss by his inability to harvest them after the condemnation. The final denial of damage to the raspberry crop is also without merit. The notice to quit possession was issued by the town on April 20, 1999, long before the time for a "pick your own" harvest planned by the lessee. These denials of damage to the lessee's growing crops are not supported by the evidence.
It is important to note that the presence of the growing crops on the subject property was not included by any of the appraisers in their computation of value for the land taken by the town. An allowance to the lessee for damages to his growing crops under the authority of the statute provided would not, therefore, result in any duplication of damages. Potential profits are not includable in the compensation due the separate landowner for his fee. Under § 48-14, they belong to the owner of the growing crops whoever that might be.
The term "crop" encompasses all products of the soil that are grown and raised annually and gathered during a single season. It does not matter whether the product was sown by man or whether it occurred naturally, both are considered crops. The valuation of a crop in eminent domain proceeding depends on whether the crop is immature or whether it is ready for harvest, If the crop is mature, its value is generally determined by examining the market harvest value of similar crops in the same locality on the day of the taking. Most courts hold that immature crops are to be valued by estimating the net revenue that would have been earned had the crop been allowed to mature. 4 P. Nichols, Eminent Domain (3d Ed.) § 13.09[6], pp. 13-119 — 120. Even though the term "crop" usually refers to plants cultivated and harvested within a single season, there are crops produced by plant which are not annuals, but have a life span lasting years. Berries are examples of plants which have a productive life span longer than a single season. 4 P. Nichols, Eminent Domain, supra, p. 13-122. CT Page 15094
Not all vegetation fits neatly into the categories of ornamental, nursery stock, timber or crops. Christmas trees are an example. Christmas trees are grown to be cut and sold, but they are not an annual crop. The fact that the majority of Christmas trees are cut prior to sale prevents them from being considered nursery stock. One accepted manner of valuing Christmas trees is by a unit value whereby a cost is computed for each tree taken. This amount is multiplied by the number of trees taken to determine the condemnee's total compensation for the trees taken. 4 P. Nichols, Eminent Domain, supra, p. 13-123. If the land upon which the crops or trees are grown is under lease, it is the lessee and not the lessor that is entitled to compensation for the crops or trees taken. P. Nichols, Eminent Domain, supra, p. 13-121.
Edward Young, Jr., lessee of the subject property at the time of taking, is entitled to damages for his growing crops as follows: $5,775 for the loss of net profit that he would have earned from the sale of his hay crop in 1999; $4,000 for the loss of net profit that he would have earned on his first raspberry harvest in 1999; and $16,000 on the sale of his Christmas trees of varying height and maturity; the total damages being $25,775.
Having previously found that the value of the subject property is $2,100,000, judgment may enter:
(1) For the Estate of Frederick J. Young in the amount of $557,500, being the balance of its share of $1,957,500 in the total value of the property less the deposit of $1,400,000 previously paid, with interest on such excess at the rate of 8% per annum from the date of taking on January 20, 1999, to the date of payment, together with costs and a reasonable appraisal fee of $3,500;
(2) For Ravenswood Development Corporation in the amount of $142,500, being the balance of the value of the subject property, with interest at the rate of 8% per annum from the date of taking on January 20, 1999, to the date of payment, together with costs and the return of its deposit held in escrow; and
(3) For Edward Young, Jr., in the amount of $25,775, with interest at the rate of 8 % per annum from the date of taking on January 20, 1999, to the date of payment.
William C. Bieluch Judge Trial Referee