[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding is an appeal from the assessment of damages incident to a condemnation. As with some recent decisions; see, e.g., Commissioner ofTransportation v. Connemara Court, L.L.C., 46 Conn. Sup. 623, 763 A.2d 696
(2000); Bristol v. Milano, 45 Conn. Sup. 605, 732 A.2d 835 (2000); the present case has also come to the court on the wrong procedural track, as a result of directions given by the court clerk on instructions from the civil court manager of the judicial branch division of court operations. It was not entered on the court records as a separate civil action and the entry fee required by General Statutes § 52-259 was not paid. Rather, this appeal and application for review of the statement of compensation was filed, without payment of the statutory entry fee, as a further pleading in the matter, having the above title and docket number, that previously had been created for purposes of depositing with the clerk of the Superior Court, the assessed damages in the amount of $123,000. See Commissioner of Transportation v. Connemara Court, L.L.C.,
supra, 623; Bristol v. Milano, supra, 605.
Michael Hunt, property owner, has appealed from the assessment of damages paid by the Commissioner of Transportation (COT) for the total taking by eminent domain on May 19, 1999, pursuant to the provisions of General Statutes § 13a-73 (b), of the premises hereinafter described found to be necessary for the layout, alteration, extension, widening, change of grade, and improvement of the highway commonly known as Connecticut Route 66. Said premises, together with the buildings and improvements located thereon, are situated in the Town of Marlborough, County of Hartford and State of Connecticut, on the southwesterly side of Jones Hollow Road, containing 19,168 square feet, more or less, bounded and described as follows and shown on the map hereinafter referred to:
NORTHEASTERLY — by Jones Hollow Road, 143.19 feet;
SOUTHEASTERLY — by land now or formerly of the Town of CT Page 10852 Marlborough, 105.50 feet;
SOUTHWESTERLY — by North Main Street, 136.64 feet, and
NORTHWESTERLY — by other land now or formerly of the Town of Marlborough, 178.50 feet.
Said premises are more particularly delineated on a map entitled: "TOWN OF MARLBOROUGH MAP SHOWING LAND ACQUIRED FROM MICHAEL HUNT BY THE STATE OF CONNECTICUT DEPARTMENT OF TRANSPORTATION INTERSECTION IMPROVEMENTS ON ROUTE 66 May 1998 JAMES F. BYRNES, JR., P.E. — TRANSPORTATION CHIEF ENGINEER BUREAU OF ENGINEERING AND HIGHWAY OPERATIONS. Sheet 1 of 1, (78-88-1)." This is a total take. The proper perspective for the determination of the issues presented here requires that the court review the history of the subject property during Hunt's ownership as found from detailed evidence.
In 1976 the Marlborough Town Planning and Zoning Commission granted Hunt's application for the conversion of a former residence to a professional office building for his real estate agency and two other offices. At the Board of Selectmen's meeting on August 6, 1985, it was recorded that correspondence had been received from the Capitol Region Council of Governments (CRCOG) advising that funds were available for road repair/construction on local off-systems, being those not on state or federal systems. It was noted then that one area of concern to the selectmen was the five-way traffic problem at the intersection of Route 66, Jones Hollow Road, and North and South Main Streets. During the discussion, the board mentioned the possibility of buying the Hunt property to alleviate the situation, a solution they had previously considered during the immediate prior ownership of the real estate that bordered on two of the intersecting streets. At that time the Board of Finance opposed the purchase, even though the purchase had been recommended in the 1958 Plan of Development. One of the selectmen reported that Hunt did not then know what his plans were regarding the sale of his property to the town.
On December 10, 1985, the CRCOG requested the Bureau of Highways of the Department of Transportation (DOT) to include the five-street intersection at Main Street and Route 66 in Marlborough in the "Off-System Local Road Accident Reduction Program," citing accident statistics in support and the town's proposed closing of the Jones Hollow Road leg of the intersection by constructing a connector from it to North Main Street. While the CRCOG was pursuing this request with the DOT, the town attempted to negotiate the purchase of the Hunt property from him.
On February 24, 1986, a certified letter was sent by the town to Hunt CT Page 10853 confirming its interest in purchasing the property expressed one month earlier and acknowledging that it had received no asking price from him. It reaffirmed its offer of $75,000, "based upon information taken from the Assessor's cards listing a total value of $62,000 for the house and property and an allowance above that reflecting current sales prices. We feel that your property is needed to reroute Jones Hollow Road traffic onto North Main Street to alleviate and hopefully eliminate the traffic accidents that have occurred at the intersection of Rt. 66, Main Street and Jones Hollow Road." Requesting a reply within two weeks, it advised that "The Board is available to discuss and negotiate further with you." Hunt did not respond.
The Bureau of Highways on April 10, 1986, informed CRCOG and the town that Route 66 was not selected at that time for the Off-Systems Program, but the location will be considered again next year "if the Town and RPA request it." Notwithstanding local publicity on February 6, 1986, surrounding the proposed rerouting of Jones Hollow Road across the Hunt property, on July 24, 1987, an unidentified private offer was made to Hunt by local counsel in the amount of $260,000, contingent on an undisclosed mortgage and reapproval of the 1976 site plan. This offer was not accepted. Thereafter, CRCOG renewed its application to DOT under the Local Road Accident Reduction Program for several locations within its purview, including the 5-point Jones Hollow Road/Route 66 intersection. Once again, on June 30, 1988, the particular intersection was not selected.
A written offer to purchase the subject property for $225,000 was made through the town's counsel on November 27, 1990, with a request for a written response by December 19, 1990. In his reply of January 31, 1991, Hunt complained that the town's long interest in the property had effectively acted as a cloud on the title, this notwithstanding admitted unsolicited approaches "by several local professionals interested in purchasing the property." Rationalizing "that since the benefits of this purchase will accrue to all the residents of the Town in perpetuity and the market and economic risks and expenses related to the replacement of my property will be borne by me alone, that careful and considerate thought be given to ALL facets in arriving at just and fair compensation. Under the circumstances, this figure should reflect full and generous market value plus an amount necessary to offset any and all anticipated related expenses, e.g., moving, storage, fees, taxes, substantially increased mortgage and insurance expense going into the future for some years as well as the inconvenience, time and cost involved in the search for a replacement for 16 North Main Street. In my response to your letter I have prepared a figure that I feel will in some way enable me to replace the subject property with one of equivalent and potential. My offering price is $425,000." In response to Hunt's later CT Page 10854 inquiry of June 13, 1991, the town repeated its offer of $225,000 as final. Upon failure to accept within ten days, the town was prepared to commence eminent domain proceedings. Hunt failed to accept, but the town did not proceed to condemn the property.
In early 1990, the town retained consulting engineers to study the subject intersection. The outcome of this study resulted in the major recommendation of relocating Jones Hollow Road to North Main Street through town property. On May 14, 1991, the Town Planning Commission rejected this recommendation for the reason it "would have partially ruined the town center." Because of that rejection, DOT reallocated to other projects the funding it had reserved for this intersection. The town then sought the expertise of CRCOG for improvement of traffic operations in Marlborough center.
At the request of concerned citizens prior to December 16, 1991, a proposal was made to the selectmen for the acquisition and conversion of the Hunt property from its present business use as a real estate office to a Class 3 Senior Center assembly hall. For that purpose a special town meeting was held on that date. Item I on the agenda was "To consider and act upon a request of $240,000 to purchase the Hunt property, located between the old and new Town Halls, for municipal purposes. The Board of Finance voted not to recommend purchase of this property." In the discussion of this matter, the First Selectman "announced that there was an appraisal in his possession for $225,000 for the property which anyone was welcome to view." The proposal was rejected.
In the immediate years following, various meetings, correspondence and related communications were had between town, CRCOG and DOT officials. These resulted in an application for the relocation of Jones Hollow Road over a portion of the Town Hall property and property at 16 North Main Street, currently owned by Michael Hunt, under the STP Urban Transportation Program, with the Federal Highway Administration and the state sharing the cost of construction. A public involvement session properly advertised, with abutting property owners notified directly by mail, was procedurally required to initiate the project. A majority of residents attending the public involvement hearing had to support the undertaking for it to proceed. The public involvement meeting took place on October 18, 1995. Approximately forty persons attended. of these, about twelve spoke. Although Hunt attended, he is not reported in the minutes as having spoken there. No one voted against the project.
Hugh H. Hayward, representing DOT at the meeting, reviewed the prior unacceptable proposals of the town and CRCOG for the Jones Hollow Road Relocation to obtain DOT's support of the project. The current proposal to relocate the road through the Hunt property was acceptable to DOT. He CT Page 10855 acknowledged that by the state's acquisition of the Hunt property, any excess real estate outside of the right-of-way for the new road would be available to the town for its use. Funding is through the Urban Program. There would be no expense to the town. In answer to a neighbor's inquiry about costs, Hayward responded in part: "For the Hunt property we have the right-of-way amount and for the small parcel of the Town Hall property. . . . When the job does go to the formal design, someone from our right-of-way area will do a formal appraisal on the parcel and come up with a hard fast dollar amount." A DOT office memorandum dated October 26, 1995, estimated the rights-of-way costs for this project to be $150,000.
DOT thereafter developed its plan for the improvement of the intersection by changing it "from a five-legged to a four-legged configuration." The town was informed by correspondence and the public by a news release. On February 25, 1998, DOT held a public information meeting at the town hall for a discussion of its design plans. The taking of the Hunt property by DOT took place on May 19, 1999, followed by his appeal from the assessment of damages now before the court on September 16, 1999. On June 2, 2000, this appeal was referred to me as judge trial referee "for all further proceedings, including hearing, decision and judgment."
In his appeal from the assessment of damages, Hunt alleged additionally that the DOT and the town "acting in concert or as affiliates, prior to May 19, 1999, acted, with respect to Michael Hunt's property so as to effectively deprive him of economic use and proceeds thereof." The COT countered that the inverse condemnation claim was (1) insufficiently stated and undated; and (2) barred by the governing statute of limitations. In his reply to these special defenses, Hunt denied making an inverse condemnation claim, but rather claimed "an alternate date of valuation under applicable law."
Preliminary to the reassessment of damages, it is essential for the court to resolve the issue raised by Hunt's claim for an alternate date of valuation prior to the taking on May 19, 1999. The state's special defense denotes this claim as one for inverse condemnation, which the owner denied in his reply.
In support of his claim for an earlier time of valuation in this proceeding, Hunt has cited Textron, Inc. v. Wood, 167 Conn. 334; andCitino v. Redevelopment Agency, 51 Conn. App. 262. He asserts that the principles expressed in those cases authorize an alternate date of value, namely, November of 1989, when, in his unsupported opinion, the subject property had a value of $350,000, allocating $200,000 to land and $150,000 to buildings. This, he claimed, would permit the development of his CT Page 10856 property in accordance with the plan previously approved by the town zoning authorities. The owner makes a distinction between an inverse condemnation, which he does not claim, and an alternate date of valuation, which he does claim. He states that in an inverse condemnation claim, the property owner seeks to have the court fix a date of taking when there is no de jure taking proceeding, and interest runs on any award from the date of inverse condemnation determined by the court until payment; in an alternate date of valuation claim, the date of taking remains the dejure date of taking, but the value of the property is determined as of an earlier date when the acts of the condemnor created a sufficient cloud upon the property to deny the owner its full use, and interest runs from the dejure date of taking, and not from the alternate date of value.
The court does not accept or subscribe to this proposition as a correct statement of the law. Neither do the Textron and Citino cases cited by counsel support this claim of the property owner. General Statutes § 37-3c provides that "[t]he judgment of compensation for a taking of property by eminent domain shall include interest at a rate that is reasonable and just on the amount of the compensation award. . . . The interest shall accrue from the date of taking to the date of payment." Damage in an inverse condemnation proceeding, as in the traditional proceeding, includes interest. 3 P. Nichols, Eminent Domain (3d Ed. Rev. 1996) § 8.01 [4][c] p. 8-58. In an inverse condemnation proceeding, the date of valuation has been held to be the actual date of taking. 3 P. Nichols, Eminent Domain, supra, p. 8-60.
In Textron, Inc. v. Wood, supra, 167 Conn. 334, the plaintiff sought a declaratory judgment determining "whether the plaintiff's property has been effectively taken by the defendant and if so, the date of such taking." The state referee answered in the affirmative and concluded that the property "in a constitutional sense" was "taken by the Highway Department on September 8, 1966." The defendant appealed. The Supreme Court found no error. It held the taking to be one in the so-called constitutional sense pursuant to article first, § 11, of the state constitution "by a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or enjoyment is in a substantial degree abridged or destroyed. . . . Mere planning by a government body in anticipation of the taking of land for public use and preliminary steps taken to accomplish this without the statutory filing of condemnation proceedings and without physical taking is not actionable by the owner. . . . There must at least be some legal interference with the owner's power of disposition over the property, a substitution of the condemnor's dominion and control over the property for that of the condemnee." Textron, Inc. v. Wood, supra, 167 Conn. 346-47. The court concluded that the highway officials had revealed the CT Page 10857 irreversibility of the department's intent to condemn the property over a period of time from January, 1966, to September, 1966, and the filing of a map in the town clerk's office depicting the layout of the proposed highway through the subject property on September 8, 1966, "had the statutory effect of depicting that property as part of a legally laid out state highway. . . . Accordingly, there was no error in the judgment that the property in issue was taken on September 8, 1966, in a constitutional sense. . . . For by this date the state highway department's intention to take the plaintiff's property had become irreversible." Textron, Inc. v.Wood, supra, 167 Conn. 349-50.
In Citino v. Redevelopment Agency, 51 Conn. App. 262, the plaintiff brought suit in the first count for unjust enrichment and inverse condemnation. The trial court rendered judgment on the basis of unjust enrichment in the amount of $278,500, and ordered that the real estate be transferred to the defendant free and clear of all encumbrances. The trial court stated that "[w]hether the plaintiff's plight falls within the traditional boundaries of the term "inverse condemnation' is unimportant." The plaintiff, in counts two and three of his complaint, also sought damages for negligent and fraudulent misrepresentation. He appealed from the judgment for the defendant on the latter counts. The defendant cross appealed from the judgment on the first count. Concluding that the trial court's findings of no negligent or fraudulent misrepresentation on the part of the defendant were not clearly erroneous, the Appellate Court turned to the cross appeal and held that inverse condemnation had occurred. It upheld the judgment of the trial court for damages, but did so for a different reason.
The trial court stated that "traditional" inverse condemnation cannot exist where a building, although devoid of economic use, has some physical use for a purpose permitted by zoning. The question on appeal was whether anything less than a total and permanent loss of property or a property right can constitute an inverse condemnation.
"Inverse condemnation is the doctrine asserted by landowners in actions initiated by them, instead of being an action initiated by a taking authority that had the right of eminent domain but did not exercise it, and is based on the constitutional proscription forbidding the taking of private property without just compensation." It is not precluded where the property involved has not been stripped of all physical use for a purpose permitted by zoning. "The test is whether the property no longer has any reasonable and proper use and whether the economic utilization of the land has been, for all practical purposes, destroyed." Citino v.Redevelopment Agency, supra, 51 Conn. App. 279-80. "We hold that the defendant's actions in failing to implement its redevelopment plan for the area in a reasonable amount of time, although not formally abandoning CT Page 10858 the plan, and in permitting the overall deterioration of the propery within the area, amounts to a taking of the plaintiff's property without just compensation. The plaintiff has pleaded and proved an inverse condemnation for which damages are due." Citino v. Redevelopment Agency,
supra, 281-82.
From its earlier review of the facts, this court concludes that there was no action by the town or DOT, singly or in concert, to effectively deprive the property owner of the economic use and proceeds of the subject property. To the contrary, Hunt steadfastly refused to negotiate in good faith with the town when it approached him with written offers for a private sale of the property. Its offer of $75,000 on February 24, 1986, was increased on November 27, 1990, to $225,000. His delayed response on January 31, 1991, counteroffered to sell the property for an unsupported amount of $425,000, reflecting "full and generous market value plus an amount necessary to offset any and all anticipated related expenses, e.g., moving, storage, fees, taxes, substantially increased mortgage and insurance expense going into the future for some years as well as the inconvenience, time and cost involved in the search for a replacement for 16 North Main Street." The town replied on June 13, 1991, with its final offer of $225,000. This was supported by an appraisal available for public inspection. On December 16, 1991, a special town meeting rejected a proposed further offer, not recommended by the Board of Finance, to purchase the property for a senior center for $240,000. Additionally, on July 24, 1987, an unidentified private offer was made by local counsel in the amount of $260,000 contingent on an undisclosed mortgage and reapproval of the 1976 site plan.
In addition to being unsupported by the law, Hunt's claim for an alternate date of valuation is procedurally defective. On January 3, 2000, Hunt filed his reply to the COT's second and third special defenses, alleging that he does not claim an actual or purported inverse condemnation, but rather a claim for "an alternate date of valuation under applicable law." Thereafter, the COT filed a motion for reference to a referee and the exchange of appraisal reports. That same day, the court notified all parties of a hearing to be held before Judge Mary Hennessey on May 17, 2000, to determine priorities and payout amounts from the funds on deposit with the court clerk. After the hearing, orders were issued on May 17 and June 22, 2000, for payment to encumbrancers. The deposit was insufficient to make payment of all claims. On June 2, 2000, the court referred Hunt's appeal to this judge trial referee "for all further proceedings, including hearing, decision and judgment." Trial began on October 17, 2000.
In Fishman v. Urban Development Commission, the defendant, on December 13, 1966, filed a statement of compensation with the clerk of the CT Page 10859 Superior Court in the amount of $17,500. The plaintiff thereupon brought an action for an injunction restraining the defendant from condemning his land. The injunction was denied, and, on appeal, the Supreme Court on February 3, 1970, found no error. Thereafter, on April 10, 1970, a certificate of taking of the plaintiff's property was recorded, which constituted a taking of the property as of that date. In August, 1972, a judgment was rendered, revising the statement of compensation to reflect a fair market value of $65,900, from which no appeal was taken. A collateral proceeding was subsequently brought by the plaintiff, claiming interest from February 9, 1967, to April 10, 1970, on the award as revised. Judgment was rendered for the defendant, and on appeal, the Supreme Court found no error.
The ruling of the court on appeal spotlights the legal fault in Hunt's claim for an alternate date of valuation. It was the defendant's claim inFishman that "[t]he plaintiff is attempting to have, in effect, two taking dates, one of April 10, 1970, to assess damages and take advantage of the inflation in the Stamford real estate market and a second one to collect interest for almost three years." The court acknowledged that pursuant to statute, the date of the taking was the date on which the defendant recorded its certificate of taking, that is, April 10, 1970. "If, however, on the basis of special equitable considerations, the condemnee claims any other date as the true date of the taking, it is incumbent upon him to present this claim to the Superior Court prior to the enty of the order referring to a referee, for review, the defendant's assessment of damages. Research Associates, Inc. v. New HavenRedevelopment Agency, 152 Conn. 137, 140, 141. `In that way, the court could then decide whether a different date should be fixed as the taking date, and, when the reference was made, the referee could assess the factors as they existed on the date set by the court as the actual taking date.'" Stanley Works v. New Britain Redevelopment Agency, 155 Conn. 86,103.
In Research Associates, Inc. v. New Haven Redevelopment Agency, supra,152 Conn. 137, the referee fixed the date of September 17, 1962, the date on which the certificate of taking was recorded, as the date the damages were sustained by the taking. The plaintiff there, as Hunt does here, claimed that the date of taking was in fact somewhat earlier, "from August 1961 until December 1961." As the court noted, "The basis of this most unusual contention is apparently a claim, unsupported by any allegations in the complaint, of a conspiracy between the defendant, on the one hand, and the New Haven board of health and the "city authorities', on the other, to drive the price of the plaintiff's land down by denying the plaintiff the building permits necessary to repair the buildings and then condemning the premises, on December 29, 1961, as unfit for human occupation." Research Associates, Inc. v. New HavenCT Page 10860Redevelopment Agency, supra, 152 Conn. 139-40. After finding nothing in the record to support the plaintiff's claim, the court ruled that the title vested in the municipality upon the recording of the certificate of taking, and the right to just compensation then vested in the person entitled thereto. Under the statutory procedure, the state referee has the authority to determine the value only as of this date of taking, at least in the absence of special equitable considerations. "If the condemnee claims any other date as the true date of the taking, he should make this claim to the Superior Court prior to the entry of the order referring to a referee, for review, of the defendant's assessment of damages." Supra, 140-41.
The subject property, known as 16 North Main Street, is situated in the historic town center of the Town of Marlborough, a small rural suburban community. One might say it is in the center of the town center, being located between the present town hall and the site of the former town hall. It is the commercial center of the community. As classified by Hunt's appraiser, it is a 100% location for a business or professional operation. In real estate parlance, it has "location, location, and location." The two streets to which it has access are both arterial roads in the community, and they converge and meet at "Five Corners," the reduction and reconfiguration of which is the reason for this condemnation. It is near the entrance and exit ramp, No. 13, of State Route 2, the leading highway from Hartford to the southeast quadrant of the state. Crossing Route 2 at the center of Marlborough and creating the traffic problem sought to be alleviated is Route 66, the main east-west highway in the middle of the state. A state commuter parking lot is nearby.
Expensive homes, Lake Terramuggus and cottages surrounding it and nearby, and a Catholic church are in close proximity. Nearby to the south is the well-known Marlborough Tavern with a small shopping mall to its rear and another across the street. The Marlborough Barn and a cluster of other retail stores surrounding it are a short walking distance to the north. Especially relevant to this proceeding are the various professional and medical offices in the immediate area of 16 North Main Street. The property is in the "heart" of the town and its central business and professional areas.
The character of the community is rural on the outskirts with an increasing amount of new residential family construction. The town is within the Capitol Region of the state, and the City of Hartford is about 18 miles to the northwest. It is located in the southeastern corner of Hartford County, southeasterly of the Town of Glastonbury. It borders the Town of Hebron and County of Tolland on the east, and the Town of Colchester and County of New London on the south. Additionally, it CT Page 10861 borders the Town of East Hampton and Middlesex County on the west. Its unique location places 16 North Main Street, Marlborough at the crossroads to its adjoining towns and counties.
The subject property consists of 19,168 square feet, or 0.44 acre, of land having a frontage of 136.64 feet on North Main Street, the main town road, and a rear frontage of 143.19 feet on Jones Hollow Road, an arterial town road. The site is cleared and level at grade with both street frontages. Visibility is considered excellent. Utilities are on-site well water supply and on-site septic system. Public utility services exist on the property. Site improvements include a gravel driveway, an open lawn area, stonewall, shrubs and several mature trees of the ash, maple and poplar varieties. The improvements on the land consist of a six-room one and one-half story wood frame clapboard sided residential structure with dormer, containing 1,505 gross square feet, 1 and 1/2 baths, a fireplace, a full basement with oil-fired hot water heat, and an attached covered front porch 27 feet long and 7 feet wide, the lower portion being enclosed with matching clapboard, built in 1930. In addition, there is a rear porch of of about 48 square feet. A two car detached garage is located in the rear. This includes a main section of 360 square feet and a storage shed of about 50 square feet.
Originally occupied as a residence, Hunt converted its use to offices for his real estate business and for other commercial uses. A deed restriction on its purchase by Hunt in 1976 provides that the property shall not be used for a food market, hardware store, liquor store, gasoline service station, ice cream parlor or luncheonette, or for the sale of any food products to be consumed on the premises.
The property is zoned GC-General Commercial Zone, a commercial classification which permits a wide array of activities as a matter of right or by special permit. While the subject site is restricted by deed from certain uses, there are numerous activities allowable under zoning which remain possible on the property. These include, but are not limited to, business and professional offices, retail outlets, beauty and barber shops, financial institutions, medical and dental offices, funeral homes, veterinary hospital, motel, municipal facilities, churches, clubs, lodges, day care centers, and such similar uses. The subject lot is legally non-conforming with respect to minimum size. It is suitable for development commercially, subject to the remaining zoning provisions. Most lots in this zone in the immediate vicinity appear to be non-conforming with respect to size and other requirements, since this rural residential area's development appears to be post World War II and after the reconstruction of U.S. Route 2, a limited access highway bisecting the town. In view of the surrounding developments, professional office and commercial development would in all likelihood receive any CT Page 10862 necessary zoning approval
In 1976, the Town Planning and Zoning Commission approved a site plan for the expansion of the residential building existing at purchase. That plan showed an addition connecting the existing office building and the large garage. The planned addition was approximately 2,260 square feet in size with about 18 parking spaces. The office development was not begun within the required time limit of five years and the approval expired by its terms. A precedent for necessary zoning approval of future professional and commercial development exists.
The latest local revaluation of property took place as of October 1, 1993. The subject property is listed on the assessor's records as residential property with a total assessment of $71,600. The total full market value was then estimated to be $102,300.
In the opinion of both appraisers, the highest and best use of the subject property, also known as 16 North Main street, is its development as a commercial use or as offices in accordance with existing zoning regulations. With this opinion the court agrees, and so finds.
There are three approaches that may be used by appraisers in the estimation of market value. Roy L. O'Neil, Jr., Hunt's appraiser, tested all three approaches to finalize his fair market value. For the sales comparison approach, he found no recent Marlborough sales appropriate for comparison. Two sales in neighboring towns were utilized. The first was the sale of an office building at 31 Main Street on Route 66 in the town center of Hebron, on April 10, 1997, for $170,000. This property had previously sold in June of 1994 for $130,000. The other was the sale of a mixed use property, a package store on the ground floor and an apartment unit above it, at 93 Main Street, East Hampton, on September 1, 1999, for $290,000. With various adjustments to these comparables, he estimated the market value of the subject property to be $203,000.
Valuation by the cost approach was determined by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements, and then subtracting the amount of depreciation in the structures. To estimate the value of the land, he compared the sales of 370 North Main Street, Marlborough, on June 13, 1995, for $155,000; land on Austin Drive, Marlborough, on June 29, 1999, for $85,000; and 24 Hodge Road, Marlborough, on June 1, 1999, for $60,000. At the average adjusted unit price of $30 per buildable square foot, he calculated the likely sale price of the subject land to be $130,000. Using the Marshall Swift cost and depreciation guides for office buildings, together with a factor of 10% for functional obsolescence, he estimated the total replacement value of the CT Page 10863 improvements to be $65,000. By the cost approach, therefore, he concluded the market value of the subject to be $195,000.
In the income capitalization approach, the present value of anticipated future benefits of property is measured. He concluded that this approach was most directly applicable to the property in its highest and best use. A property's income stream and its resale value, or reversion, are capitalized into a current lump sum value. Since the subject property had been owner occupied and had no rental history, he made inquiry of local real estate brokers and property managers for rental rates and vacancy factors in Marlborough town center. From these results, he developed an investor's pro forma operating statement for the property. In that manner he calculated the net operating income to be $16,662.
After incorporation of the several variables into the overall rate development, he calculated the capitalization rate to be 9.08%. Since value equals the calculated net operating income of $16,662 divided by the capitalization rate, he estimated the value of the anticipated income from the existing building to be $183,500. The balance of the building potential being 2,650 square feet, he computed this to be valued at $30 per buildable square foot for an additional total of $79,500. Based on this analysis, he concluded that the total market value of the subject property as an income investment property as of the date of taking was $263,000.
This valuation, although greater in amount, is supported by the written offers of the town to negotiate the direct purchase of the subject property. On November 27, 1990, the town's counsel sent a written offer for the purchase of the subject property in the amount of $225,000. This offer was repeated in response to Hunt's inquiry of June 13, 1991. At a special town meeting held on December 16, 1991, the First Selectman disclosed "that there was an appraisal in his possession for $225,000 for the property which anyone was welcome to view." The upward difference between the two valuations could be attributed to the passage of time, over eight years, between the town's appraisal and that of O'Neil.
Mark J. Mickiewicz, a salaried civil service employee of the DOT, who formerly served in the property management division, testified as a staff appraiser, and not as an independent contract fee appraiser. The cost approach was considered, but not developed, due to the age and condition of the structures on the subject property. Three sales were considered in the market approach, one in Glastonbury and two in Hebron, no comparable sales being available in Marlborough. A residence converted to commercial use at 2839 Main Street, Glastonbury, sold on June 10, 1996, for $265,000. A single family residence at 18 Church Street, Hebron, sold on February 4, 1997, for $199,520. A former residence at 31 Main Street, CT Page 10864 Hebron, converted to a bank, sold on April 8, 1997, for $170,000. It is now used as an office building. With various adjustments, except for time, he estimated he market value of the subject property to be $117,500.
For the income capitalization approach, the state's appraiser considered market rentals at 359 North Main Street, Marlborough, 41 and 266 Hebron Avenue, Glastonbury, and 87 Main Street, Hebron. From these, he estimated a net operating income from the subject property of $13,236. By his calculation, he found the capitalization rate to be 10.75%. From these calculations, he estimated the market value of the subject property to be $123,000 as of September 18, 1998. Upon the taking of the property by the COT, this amount was deposited with the court clerk.
At the required public involvement meeting with the DOT and town officials held on October 18, 1995, it was disclosed by the DOT representative that the state was prepared to condemn the Hunt property and a small portion of the town hall property. In answer to an attendee's inquiry about the costs, he replied: "We have preliminary estimates of about 1 million dollars. For the Hunt property we have the right-of-way amount and for the small parcel of the Town Hall property. I have to stress this is just a preliminary estimate. It has to be a very reasonable amount. Things are looked at in a very preliminary state. When the job goes to the formal design, someone from our right-of-way area will do a formal appraisal on the parcel and come up with a hard fast dollar amount." A DOT office memorandum dated October 26, 1995, estimated the costs of the costs of the two-rights-of way for this project to be $150,000. The court finds that COT's valuation of the subject property fell within the preliminary budgeted amount, still leaving a reserve for the taking of a small portion of the town hall property.
"Under our law, a [judge trial] referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of [the Supreme Court] with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Internal quotation marks omitted.) Minicucciv. Commissioner of Transportation, supra, 211 Conn. 388; Birnbaum v.Ives, 163 Conn. 12, 21-22, 301 A.2d 262 (1972); Feigenbaum v. Waterbury,20 Conn. App. 148, 153, 565 A.2d 5 (1989). It is his task to reach a result that gives the plaintiffs, "as nearly as possible, a fair equivalent in money as just compensation for the [property] taken. . . ."Mathis v. Redevelopment Agency, 165 Conn. 622, 623, 345 A.2d 33 (1973);Feigenbaum v. Waterbury, supra, 153-54. In the performance of this duty, CT Page 10865 based upon all the circumstances, due consideration of the evidence and the opinions of expert witnesses, general knowledge of the elements constituting value, and a viewing of the property, nearby office and commercial developments and surrounding areas, the court finds the value of the subject property to be $263,000.
Having found that the value of the subject property is $263,000, judgment may enter for Michael Hunt in the amount of $140,000, being the balance of the value of the subject property over the amount of the deposit previously disbursed by order of the court to prior encumbrancers, with interest at the rate of 8% per annum from the date of taking on May 19, 1999, to the date of payment, together with costs and a reasonable appraisal fee of $2,200; and less payment by the Commissioner of Transportation from said total sum to the following remaining unpaid encumbrancers in full payment, without any further interest, of the balance due on their respective liens: (a) $11,722.93 to Deborah Summer Lackey, do Robert M. Elliott, P.C.; and (b) $1,367.28 to Kalom Borst, P.C.; each of whom shall furnish to the Commissioner of Transportation before payment of an appropriate release for recordation and other necessary documentation.
William C. Bieluch Judge Trial Referee